Dolph BRISCOE, Governor of the State of Texas, et al., Appellants,

v.

Edward H. LEVI, United States Attorney General, et al.

No. 75–1903.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 12, 1975.

Decided April 19, 1976.

Cynthia L. Attwood, Atty., Dept. of Justice, with whom Earl J. Silbert, U. S. Atty., and Brian K. Landsberg, Atty., Dept. of Justice, Washington, D. C., were on the brief for appellees. John A. Terry, Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellees.

David M. Kendall, First Asst. Atty. Gen. of the State of Texas, Dallas, Tex., with whom John W. Odam, Executive Asst. Atty. Gen. of the State of Texas, Austin, Tex., was on the brief for appellants. Charles S. Rhyne, William S. Rhyne, Donald A. Carr and Richard J. Bacigalupo, Washington, D. C., entered appearances for appellants.

Before Mr. Justice CLARK,* of the Supreme Court of the United States, and ROBINSON and MacKINNON, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

The State of Texas in this litigation contends that the Attorney General and the Director of the Census incorrectly determined that Texas became subject to the corrective provisions of the Voting Rights Act of 1965,[1] by virtue of the 1975 amendments [2] thereto, because more than five percent of the voting age citizens of Texas are

---

* Mr. Justice Tom Clark, United States Supreme Court, Retired, sitting by designation pursuant to 28 U.S.C. § 294(a).

1. Act of Aug. 6, 1965, Pub. L. No. 89–110, 79 Stat. 437, *as amended* 42 U.S.C.A. § 1973 *et seq.* (1976 Supp.).

2. Act of Aug. 6, 1975, Pub. L. No. 94–73, 89 Stat. 400.

members of a single (foreign) language minority and because Texas printed at least some of its election materials only in English as of November 1, 1972. The judgment of the district court agreed generally with the position of the federal government, and we affirm that decision.

The Voting Rights Act of 1965 provides, *inter alia,* that "no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device" with respect to which certain determinations specified in section 4(b) have been made by the Attorney General and the Director of the Census.[3] In its 1975 Amendments to the Act, Congress expanded the original definition of "test or device" to include elections conducted only in English where a substantial fraction of the population of a particular jurisdiction speaks a foreign language.[4]

The sanctions of the Act are triggered by the determinations referred to above. Specifically, after the adoption of the 1975 Amendments, section 4(b) of the amended Act requires the Director of the Census to make two determinations on or after August 6, 1975. First, he must determine whether "more than five per centum of the citizens of voting age residing in [a] State or political subdivision are members of a single language minority."[5] Second, the Director must determine with respect to each jurisdiction whether

> less than 50 per centum of the citizens of voting age were registered on November 1, 1972, or [whether] less than 50 per centum of such persons voted in the Presidential election of November 1972.[6]

The Attorney General must then separately determine whether the particular state or political subdivision in question maintained a "test or device" on November 1, 1972.[7] In the event that both officials make affirmative determinations in the areas assigned to them by the statutory provisions mentioned above (also referred to as the "trigger" provisions), the particular state or subdivision becomes subject to corrective provisions of the amended Act[8] until such time

---

**3.** 42 U.S.C. § 1973b(a) (1970).

**4.** In the 1965 Act, "test or device" was defined to mean

> any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

42 U.S.C. § 1973b(c) (1970). The above types of tests and devices were banned nationwide (*i. e.,* not merely in areas where the trigger requirements of section 4(b) have been met but in *every* state) for five years by the 1970 Amendments to the Voting Rights Act, § 6, 84 Stat. 315, *as amended* 42 U.S.C.A. § 1973aa (1976 Supp.), and this ban was later made permanent. Act of August 6, 1975, Pub. L. No. 94–73, Title I, § 102, 89 Stat. 400. The 1975 Amendments expand the definition of "test or device" to include

> any practice or requirement by which any State or political subdivision provided any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, only in the English language, where the Director of the Census determines that more than five per centum of the citi-

zens of voting age residing in such State or political subdivision are members of a single language minority.

42 U.S.C.A. § 1973b(f)(3) (1976 Supp.). The new category of tests and devices has not been prohibited on a nationwide basis; rather, this category is only banned in jurisdictions where the trigger requirements of section 4(b) have been met. *See* 42 U.S.C. § 1973aa(b) (1970).

The facts of this case arise under this new category of tests and devices.

**5.** 42 U.S.C.A. § 1973b(f)(3) (1976 Supp.). Strictly speaking, this determination is not a part of the Act's trigger but rather provides the basis for the Attorney General's determination that a "test or device" has been maintained in the particular jurisdiction. *See* note 4 *supra.*

"Language minority" is defined to mean persons who are American Indian, Asian American, Alaskan Natives, or of Spanish heritage. 42 U.S.C.A. § 1973*l*(c)(3) (1976 Supp.).

**6.** 42 U.S.C.A. § 1973b(b) (1976 Supp.).

**7.** *Id.*

**8.** The most relevant of these for the purposes of this case are a prohibition on conducting elections only in English, 42 U.S.C.A. §§ 1973, 1973b(f)(2) (1976 Supp.); a requirement that election and registration materials be provided in the language of the applicable language mi-

as that jurisdiction, in a suit before a three judge court in the United States District Court for the District of Columbia, proves that it has not used a "test or device" with a discriminatory effect or purpose in ten years preceding the filing of the suit.[9]

As early as July 14, 1975 (three weeks before the effective date of the 1975 amendments), appellant White, who is Secretary of State for Texas and the state's chief election official, requested the Director of the Census and the Attorney General to grant the state a formal hearing prior to making the determinations regarding Texas required by the amended Act. It was suggested that White could present evidence which was allegedly relevant to the question of whether Texas is covered by the new law. Although the statute itself makes no provision for a hearing, the Bureau of the Census did agree to provide Texas with an opportunity to present any data and supporting documentation relevant to the census determinations, and agreed to receive and consider such data fully and fairly.[10] A meeting was scheduled for September 5, 1975.[11]

On September 4, the day before the meeting, the Bureau of the Census issued a press release [12] which stated that the Director had

determined that the State of Texas met two of the "trigger" requirements: 1) that greater than five percent of the citizens of voting age were persons of Spanish heritage and 2) that there was less than a 50 percent voter participation in Texas in the presidential election of November, 1972. The meeting was held the next day as scheduled, and although the state officials were informed that the Bureau would evaluate any evidence presented by Texas and would reconsider their determination as to the trigger requirements of the Act if that evidence showed they had erred,[13] no facts were presented which the Bureau considered required a change in this initial determination.[14]

On September 8, 1975, appellants filed suit in district court for a declaratory judgment on how and under what circumstances the determinations called for by section 4(b) of the amended Voting Rights Act should be made.[15] They also sought an injunction against the defendants restraining them from publishing any determination concerning the state of Texas in the Federal Register pursuant to the amended Act. On September 12, the court granted the federal parties' motion for summary judgment,[16] denied the Texas parties' motion for prelim-

---

nority group, 42 U.S.C.A. § 1973b(f)(4) (1976 Supp.); a requirement that all changes in voting practices and procedures be submitted to the Attorney General or subjected to a declaratory judgment action before a three judge court in the District Court for the District of Columbia for a determination as to whether such changes have a discriminatory purpose or effect, 42 U.S.C.A. § 1973c (1976 Supp.); and the employment of federal voting examiners and observers, 42 U.S.C.A. § 1973d (1976 Supp.).

9. 42 U.S.C.A. § 1973b(a) (1976 Supp.).

10. Appellees' Brief at 11; App. 11.

11. App. 149–50.

12. Supp.App. 49–55.

13. App. 180–81. *See* note 34 *infra.*

14. App. 136.

15. App. 9. Specifically, the Texas parties asked the court to declare: 1) whether the Director of the Census, in making the determi-

nations required by section 4(b) of the Act, may use estimates; 2) whether, in counting "citizens of voting age," the Director of the Census may include "persons convicted of felonies but not pardoned, persons in the State for temporary purposes, persons not mentally competent, and aliens, either legal or illegal . . . ."; 3) whether the Director of the Census had appropriately construed the 50 percent voter participation portion of the section 4(b) trigger formula; 4) whether the section 4(b) trigger formula and the section 4(f)(3) definition of "test or device" could be applied retroactively to November 1, 1972; and 5) whether the Attorney General may determine that a jurisdiction employed a "test or device" as defined in section 4(f)(3) without determining whether the conditions stated in section 4(d) of the Act have been met. Complaint, App. 6–8.

16. This motion was originally made by the federal parties as a motion to dismiss, but was treated by the court as a motion for summary judgment without objection by either side. App. 141.

inary relief, and dismissed the case.[17] This appeal followed.[18]

## I.

We first consider the jurisdiction of the district court to review the determinations of the Director of the Census, because our jurisdiction and the extent of our reviewing authority necessarily depend upon the original jurisdiction which may or may not exist in the District Court. While the decision of the trial judge on this point has not been challenged on appeal,[19] the *scope* of the lower court's subject matter jurisdiction is important to a proper resolution of this case.

Section 4(b) of the Voting Rights Act of 1965 [20] provides:

A determination or certification of the Attorney General or of the Director of the Census under this section . . . shall not be reviewable in any court and shall be effective upon publication in the Federal Register.

That provision was held constitutional in *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) which stated:

The Court has already permitted Congress to withdraw judicial review of administrative determinations in numerous cases involving the statutory rights of private parties. For example, see *United States v. California Eastern Line,* 348 U.S. 351, 75 S.Ct. 419, 99 L.Ed. 383; *Switchmen's Union v. National Mediation Bd.,* 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61. In this instance, the *findings* not subject to review consist of objective statistical determinations by the Census Bureau and a routine analysis of state statutes by the Justice Department. These functions are unlikely to arouse any plausible dispute, as South Carolina apparently concedes. In the event that the formula is improperly applied, the area affected can always go into court and obtain termination of coverage under § 4(b), provided of course that it has not been guilty of voting discrimination in recent years. This procedure serves as a partial substitute for direct judicial review.

*Id.* 383 U.S. at 333, 86 S.Ct. at 821, 15 L.Ed.2d at 789. (emphasis added). The Court construed this provision in a manner consistent with the interpretation given to the Act as a whole: an "inventive" solution to "nearly a century of systematic resistance to the Fifteenth Amendment" which would "shift the advantage of time and inertia from the perpetrators of the evil to its victims." *Id.,* 383 U.S. at 328, 86 S.Ct. at 818, 15 L.Ed.2d at 786. Thus, "the measure prescribes remedies for voting discrimination which go into effect without any need for prior adjudication." *Id.* at 327–28, 86 S.Ct. at 818, 15 L.Ed.2d at 786.

■ The trial court in the instant case held that this provision did not divest it of "narrow" jurisdiction to determine whether the Director of the Census followed Congressional intent and direction.[21] The dis-

---

**17.** Oral opinion, App. 219; Order, App. 230.

**18.** On September 91, 1975, a division of this court (Leventhal and Wilkey, JJ.) denied the Texas parties' motion to enjoin publication of the section 4(b) determinations pending appeal, and ordered held in abeyance their alternative motion to enjoin the Attorney General's enforcement of section 4 of the Voting Rights Act as to Texas while its appeal was pending. Thereafter, on September 23, 1975, the Attorney General and the Director of the Census published a joint determination which stated that the state of Texas had been determined by those officials to meet the trigger requirements of section 4(b) of the amended Act. 40 Fed.Reg. 43746 (Sept. 23, 1975).

**19.** Both sides now appear to accept the decision of the lower court on the existence and scope of its jurisdiction. *See* Brief of Appellants at 9–10; Brief for Appellees at 15–16. The only question raised is whether the district judge overstepped the jurisdictional bounds which he himself set. Brief for Appellees at 16. This argument is considered below. *See* text at —— of 175 U.S.App.D.C., at 1270 of 535 F.2d *infra.*

**20.** Act of Aug. 6, 1965, Pub. L. No. 89–110, § 4(b), 79 Stat. 438. This provision continues to appear in the Act following the 1975 amendments. 42 U.S.C.A. § 1973b(b) (1976 Supp.).

**21.** App. 221–22.

trict judge stated the following standard for review:

This is not a review of the computations made by the Director of Census following publication but is an examination prior to publication inquiring into whether or not the Bureau of Census or the Director of Census has properly applied the Act.

The test that the Court feels must be applied in this circumstance under the narrow jurisdiction which I have indicated is here present is to determine whether or not the interpretation given by the Director of Census to the statute is rational and whether it is or is not in the large consistent with the declared congressional purpose and the legislative history.

(App. 222–23).

\* \* \* \* \* \*

[A] court cannot review except as I have here done to determine that the Director of Census has not acted in an arbitrary or illegal manner but rather that he has proceeded in a rational manner, consistent with the apparent meaning of the statute and that his interpretations of it at this stage must be sustained.

(App. 225).

We agree that this was the proper standard of review for the court to apply. In *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), the Supreme Court ruled that a federal district court had jurisdiction to hear a challenge to a certification of a collective bargaining unit by the National Labor Relations Board despite a provision in the National Labor Relations Act which precludes direct review of such certi-

fications.[22] In *Leedom,* the Board had, without a vote among the professional employees, included both professional and non-professional employees in the same bargaining unit in clear violation of section 9(b)(1) of the National Labor Relations Act, which provided that "the Board shall not (1) decide that any unit is appropriate . . . if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit."[23] The Court allowed direct review of this determination on the ground that:

This suit is not one to "review," in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act.

358 U.S. at 188, 79 S.Ct. at 184, 3 L.Ed.2d at 214. Similarly, in *International Association of Machinists and Aerospace Workers v. National Mediation Board,* 138 U.S.App. D.C. 96, 425 F.2d 527 (1970), we allowed a limited review of a decision of the National Mediation Board not to discontinue mediation and proffer arbitration under the Railway Labor Act, notwithstanding a clear legislative intent to preclude judicial review of Mediation Board actions, stating that:

An exception to the rule of immunity has been carved out and jurisdiction of the courts established, where the papers establish on their face a plain violation by the Board of a statutory command which warrants immediate intervention by an equity court.

Government can be delayed indefinitely before it takes the first step toward industrial peace." Therefore, § 9(d) was written to provide "for review in the courts only after the election has been held and the Board has ordered the employer to do something predicated upon the results of the election."
358 U.S. at 191, 192, 79 S.Ct. at 186, 3 L.Ed.2d at 216. (Brennan, J., dissenting) (footnotes eliminated).

**22.** The legislative history of the Wagner Act, and of the Taft-Hartley amendments, shows a considered congressional purpose to restrict judicial review of National Labor Relations Board representation certifications to review in the Courts of Appeals in the circumstances specified in § 9(d), 29 U.S.C. § 159(d).

\* \* \* \* \* \*

Congress knew that if direct judicial review of the Board's investigation and certification of representatives was not barred, "the

**23.** 29 U.S.C. § 159(b)(1) (1958).

*Id.* at 105, 425 F.2d at 536. *See also Thermtron Products, Inc. v. Hermansdorfer,* 423 U.S. 336, 351, 96 S.Ct. 584, 593, 46 L.Ed. 542, 554 (1976); *Municipal Light Boards of Reading & Wakefield Massachusetts v. FPC,* 146 U.S.App.D.C. 294, 450 F.2d 1341 (1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972).[24]

■ It is therefore apparent that even where the intent of Congress was to preclude judicial review, a limited jurisdiction exists in the court to review actions which on their face are plainly in excess of statutory authority. That such a limited review is permissible in this case is also evident from the opinion of the Supreme Court in *South Carolina v. Katzenbach, supra,* where the Court construed the statutory provision which is in question here to prohibit review of *"findings"*—that is, the "objective statistical determinations by the Census Bureau and . . . routine analysis of state statutes by the Justice Department." [25] The district court in the instant case was careful to note that the actual computations made by the Director of the Census were *not* within its jurisdiction to review, and that its scope of review was limited to determining whether the Director acted "consistent with the apparent meaning of the statute." [26] Narrowly defined in this manner, the jurisdiction of the trial court to consider the Director's determinations is supported by precedent, and we therefore affirm the authority of the district court to review in the present case.

## II.

■ On this appeal appellants first contend that the Director of the Census and the Attorney General erred in failing to grant Texas "some sort of a hearing" before determining that it was covered by the Act. Although they apparently concede that they are not entitled to a *formal* hearing under the Voting Rights Act [27] and do not challenge the holding of the district court that "[t]he Administrative Procedure Act in no way affords a hearing under these circumstances," [28] they do argue that

> some opportunity to demonstrate non-coverage and some elements of fair play must be offered and accorded to a state. To require less, would raise serious constitutional problems concerning the Act—problems that must now be measured by and answered by application of the "Our Federalism" philosophy of *Younger v. Harris* [401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)].

(Appellants' Brief at 12). To the extent that this argument is supposed to be a constitutional challenge to the Voting

---

**24.** In the *Municipal Light Boards* case, we cited both *Leedom* and *Int'l Assn. of Machinists,* and stated:

> Our ruling is in the context of the kind of claim presented to us—that there has been an abuse of agency discretion. We do not speak to a case where the claim is that the suspension action taken or declined by the agency is plainly without any statutory authority or in defiance of a "clear and mandatory" statutory command or reflects an error evident on the face of the papers—considerations which have been held to constitute an exception, a basis for judicial correction in the case of other types of agency action which Congress has withdrawn from judicial review jurisdiction.

146 U.S.App.D.C. at 305, 450 F.2d at 1352 (footnote eliminated).

**25.** *See* text at ⸺ of 175 U.S.App.D.C., at 1261 of 535 F.2d, *supra.*

**26.** *See* text at ⸺ of 175 U.S.App.D.C., 1264 of 535 F.2d, *supra.*

**27.** Appellants' Brief at 12.

**28.** App. 223. Since the appellants do not contend that they were denied an opportunity to submit written comments prior to the Director's determinations, it appears that the type of "hearing" they seek is the trial-type hearing detailed by sections 7 and 8 of the APA, 5 U.S.C. §§ 556, 557 (1970), which includes an opportunity to cross-examine and to know and meet the opposing evidence. A trial-type hearing before an agency is most appropriate where, as here, there are disputed issues of fact to be resolved. 1 K. Davis, Administrative Law Treatise § 7.01 (1958). Hearings under sections 7 and 8, however, are required *only* when either rulemaking or adjudications are required by statute to be "on the record after opportunity for an agency hearing," 5 U.S.C. §§ 553, 554 (1970). The Voting Rights Act contains no such requirement.

Rights Act, we have no jurisdiction to consider it because appellants did not apply for a three judge court upon filing their action.[29] If, on the other hand, it is directed to our *interpretation* of that statute, it is not persuasive. In *Younger, supra,* the Supreme Court sustained the district court's refusal to enjoin a state criminal prosecution under California's Criminal Syndicalism Act, based in part upon

> a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. . . . What the concept does represent is a system in which there is sensitivity to the legitimate interests of both National Government, anxious though it may be to vindicate and

protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.[30]

In *Younger* the Court was dealing with a requested *judicial* action, and thus was saying that in carrying out their federal responsibilities courts should be sensitive to state interests. By contrast, the federal action involved in the instant case was *legislative,* and although the same advice might well be given to the Congress, *Younger* does not place in the hands of this court responsibility for the balancing which determines to what extent a federal statute should intrude upon state interests. That task primarily belongs to Congress, and the resolution of the matter which Congress makes should not be disturbed by a court unless it violates the Constitution.

▮ In the case before us there is little direct evidence that Congress did consider requiring a hearing prior to the making of the required determinations[31]; but even if

---

**29.** By statute, all applications for an injunction against the execution of an Act of Congress which is alleged to be unconstitutional must be heard in the first instance by a three judge district court. 28 U.S.C. § 2282 (1970). *But cf. Gonzalez v. Automatic Employees Credit Union,* 419 U.S. 90, 96–98, 95 S.Ct. 289, 293–294, 42 L.Ed.2d 249, 256–57 (1974). Since there was no such application here, the issue of constitutionality cannot properly be reviewed on the merits by this court, *Stratton v. St. Louis Southwestern Ry. Co.,* 282 U.S. 10, 51 S.Ct. 8, 75 L.Ed. 135 (1930), although had the constitutional issue been raised in the court below we would be permitted to review that court's jurisdiction to decide the matter. *McLucas v. DeChamplain,* 421 U.S. 21, 30, 95 S.Ct. 1365, 1371, 43 L.Ed.2d 699, 709 (1975). The issue of the district court's jurisdiction, however, is not raised on appeal.

Even if 28 U.S.C. § 2282 had been properly invoked below, this court would have no jurisdiction to consider the Act's constitutionality, since appeal then lies directly to the Supreme Court. 28 U.S.C. § 1253 (1970); *Oldroyd v. Kugler,* 461 F.2d 535 (3d Cir.1972); *Lee v. Roseberry,* 200 F.2d 155 (6th Cir.1952); *Jackson v. Cravens,* 238 F. 117 (5th Cir.1916).

**30.** 401 U.S. at 44, 91 S.Ct. at 750, 27 L.Ed.2d at 675.

**31.** The only reference to this issue in the legislative history appears to be in a statement by the members of the Republican minority on the

House Judiciary Committee in the committee report on the Voting Rights Act:

> The "numbers game" approach, obviously designed to hit a predesignated target, is clearly an arbitrary device unless we are to believe that, without evidence, without a judicial proceeding or *a hearing of any kind,* a contrived mathematical formula is capable of fairly delineating those States that discriminate on account of race or color and those that do not.

H.R.Rep.No.439, 89th Cong., 1st Sess., at 45 (1965), U.S.Code Cong. & Admin.News 1965, p. 2437, 2473 (emphasis supplied). Although this may be some evidence that the point was discussed and rejected in committee, it does not necessarily demonstrate that the idea of requiring a hearing was given reasoned consideration, nor does it give us an insight into the rationale for the possible rejection. In short, it is not at all useful.

The appellees argue that there was a proposal [Amendment No. 106 to S. 1564] made on the floor of the Senate by Senator Eastland to amend section 4 of the Voting Rights Act of 1965 to require that section 4(b) determinations be made "after notice and opportunity for hearing have been granted in accordance with the provisions of the Administrative Procedure Act," but that this amendment was "tabled and given no further consideration by the Senate." Appellees' Brief at 28. However, appellees have misread the action of the Senator and its legislative significance. The passage in the Congressional Record which appellees cite

they did not study and reject the idea, the purpose of the Act is so inconsistent with any notice-and-comment requirement as to compel the conclusion that a predetermination hearing cannot be implied from the terms of the statute. The basic thrust of the Voting Rights Act is to avoid delay of any kind in the enforcement of voting rights [32]; the determinations under section 4(b) "consist of objective statistical determinations by the Census Bureau and a routine analysis of state statutes by the Justice Department." [33] It would be incongruous if we were to conclude that a procedure involving a great administrative burden and delay could be implied from a statute designed to eliminate these obstructions. Nor is it logical to think that Congress would intend to impose such a procedural encumbrance upon what are essentially mechanical determinations.

This is not to say, of course, that the Attorney General and the Director of the Census could not voluntarily grant a hearing to any affected state where they felt this could be done without defeating the purpose of the statute. Indeed, a hearing was held here. It is of course unfortunate that Texas could not be given this hearing prior to publication of the Director's determinations; but we cannot second-guess his judgment that, with national elections a year away, those determinations had to be made public at the earliest possible date. We note that the Bureau indicated it would reconsider its findings if the state officials presented information demonstrating that the Bureau had erred [34]; and that at the time of the September 5 meeting, the Attorney General had not yet made his determination as to whether Texas employed a "test or device" in 1972.[35] Under these circumstances we believe that the State of Texas was afforded a participation in the decision-making process under the Voting Rights Act greater than the statute requires.

states that Amendment 106 was "submitted" by Senator Eastland and was "ordered to lie on the table and to be printed." 111 Cong.Rec. 8760 (April 28, 1965). This does *not* mean that the Senator proposed a formal amendment to the bill which was then tabled by action of the Senate; rather, this procedure is one whereby an amendment which is being contemplated by a Senator may be printed, given a calendar number and called up at some future point for consideration. The object is to give the Senate some notice of an amendment that might be offered. It may *never* be called up, and indeed there is no evidence that Amendment 106 was ever offered as an amendment to the bill. Thus it appears that Amendment 106 was never actually *considered* by the Senate and no formal action (even tabling) was ever taken by the Senate upon it. Under these circumstances, such action by the Senator is no indication of Congressional intent in the legislative history of the Voting Rights Act. "An amendment submitted, ordered to lie on the table and be printed, has no parliamentary standing or status . . ." *See* Senate Procedure, S.Doc. No. 93–21, 93d Cong., 1st Sess. 72 (1974). All that really happened was that the Senator prepared a draft of a contemplated amendment, gave notice to the Senate of such draft, and then decided later not to offer the amendment to the bill.

**32.** *See South Carolina v. Katzenbach,* 383 U.S. at 327–28, 86 S.Ct. at 818, 15 L.Ed.2d at 786.

**33.** *Id.* at 333, 86 S.Ct. at 821, 15 L.Ed.2d at 789.

**34.** The September 5 meeting between representatives of the Department of Justice and the Bureau of the Census, and appellant White, Secretary of State of Texas, was recorded by Mr. White. In a transcript read into the record by Mr. White in the proceedings below, the following statement is made by Meyer Zitter, Chief of the Population Division of the Bureau of the Census:

> [M]y purpose here today is to see whether there is any materials you have that would help us decide and to make a determination is, that is, basically, the population estimates and making a determination of the per cent voting should be given from what we came up with and *there is nothing that we have put out yet that precludes us from making changes.* . . .

(App. 180, emphasis added). Zitter is also quoted as later saying:

> Towards the end of the next week, even if it goes in the Register, if we find that on the basis of evidence that our arithmetic is wrong or there is a better set of data available, we are not precluded from making changes. . . .

(App. 181).

**35.** The closing sentence of the press release which announced the Bureau's findings stated: "The Attorney General has not yet made a final determination under Title II." (Supp.App. 50).

### III.

Appellants raise two challenges to the determinations made by the Director of the Census.[36] First, they claim that the Director used inaccurate data in computing the number of citizens of voting age because he failed to exclude a sufficient number of aliens from his computations. In order to make the required determination, the Bureau projected its 1970 census figures into 1972 and found a total population of voting age in Texas on November 1, 1972 of 7,655,000, less 140,657 aliens of voting age on that same date, to indicate 7,514,343 Texas citizens of voting age.[37] The appellants' contention is that the figure of 140,-657 aliens is unreasonably low, and thus that the figure used by the Director for Texas citizens of voting age was too high.[38]

The main argument raised by appellants is that other statistics exist which demonstrate that the Bureau of the Census figure for aliens of voting age in Texas is patently unrealistic. To begin with, they cite Immigration and Naturalization Service [INS] figures which show that there were 263,000 *legal* aliens in Texas in 1972.[39] There is no indication of how many of these were of voting age. As for *illegal* aliens, numerous conflicting sources are quoted to show that a great number of them lived in Texas in 1972, far more than 140,657. INS figures are said to demonstrate that 209,912 illegal aliens were deported from Texas in 1972,[40] but that statistic is subject to at least three criticisms: again, there is no indication of how many of these were of voting age; nor is there any correction made for individuals who might have been deported two or more times; nor does this tell us how many were residing in the state on November 1, 1972. The Commissioner of the INS is quoted as saying that the number of illegal aliens in the state was four to five times the number being deported.[41] Besides the three criticisms made above which are also applicable to this statistic, its vagueness makes it un-

**36.** Two additional challenges were litigated in the district court, but not raised on appeal: 1) whether the Director of the Census erred in counting convicted felons, persons in the state for temporary purposes (such as military personnel), and persons not mentally competent as "citizens" in determining the number of citizens of voting age in the state; and 2) whether the Director erred in using a different definition of "persons of Spanish heritage" for Texas and four other states than he used for the rest of the United States. We express no opinion on these issues.

**37.** App. 133.

**38.** The total number of Texas citizens of voting age is specifically relevant to both aspects of the second determination required of the Director (*see* text at —— of 175 U.S.App.D.C., at 1261 of 535 F.2d, *supra*) because it directly affects the determination as to whether 50 percent or more of the citizens of voting age were registered to vote on November 1, 1972, and whether "50 percent or more of such persons [*see* text at —— —— of 175 U.S.App.D.C., at 1270–1276 of 535 F.2d, *infra*] voted in the Presidential election of November 1972."

**39.** Department of Justice, Annual Report of the Commissioner of the Immigration and Naturalization Service 97 (1972) [part of this document appears in the record on appeal as Plaintiffs' Exhibit 1, but the table containing the figures which appellants cite does not]. Although appellants use figures of both 263,000 (Appel-

lants' Brief at 13) and 263,200 (Appellants' Supp. Brief at 3), the correct figure for *permanent* residents appears to be 262,715.

**40.** In his testimony during the proceedings below, appellant White attributes this figure to the Management Analyst Officer of INS. App. 158. No citation is given. In their briefs, appellants cite to the 1972 Annual Report [Plaintiff's Exhibit 1], *supra* note 39, as a source for this statistic. Appellants' Brief at 13; Appellants' Supp. Brief at 3. But examination of that document reveals no such figure; in fact, the 1972 Annual Report, *supra* note 39, at 76, indicates that only 16,266 aliens were deported from the *entire* United States during the year ending June 30, 1972. [Another 450,927 aliens were "required to depart" from the entire United States during the same period. *Id.*]

**41.** Address by Leonard F. Chapman, Jr., Commissioner of the United States Immigration and Naturalization Service, before the Maryland Chiefs of Police Assn. and the Advertising Club of Baltimore, in Baltimore, Maryland, November 13, 1974 [*Plaintiffs' Exhibit 4*]. Although appellants also attribute the same statement to then-Attorney General William B. Saxbe, an examination of his speech before the Cameron County and Hidalgo County Bar Associations in Brownsville, Texas, October 30, 1974 [Plaintiffs' Exhibit 5] shows that that statistic was not mentioned.

suited for the type of numerical calculation required of the Bureau of the Census here.

Next, a recent study made under contract for the Immigration and Naturalization Service is said to indicate that 2,693,600 illegal Mexican nationals went undetected in the United States in the year 1972.[42] Again, there is no indication of how many of these were of voting age; no specification of how many resided in Texas; no means of ascertaining how many were there on November 1, 1972; and no consideration of how many *non*-Mexican aliens might have been in Texas illegally at that time. Moreover, it is to be noted that these are *estimates*,[43] whereas the census figures which they would replace are *projections* from an actual count.[44] Presumably the aliens who are not counted by the census would not be included in the *total* Texas population figures, either; but if statistics from two or more sources are used, aliens absent from one figure might be included in another, thus magnifying the inaccuracies.

Finally, appellants intermix "cautious estimates" from all these sources to arrive at a "more-than-reasonable" figure for the total number of aliens in Texas [with no regard, apparently, to their age].[45] The efforts by appellants to correct the source figures to meet some of the criticisms made above—*e. g.*, that certain statistics do not take into account the possibility that some aliens might have been deported more than once—only compound the uncertainties in the final figure.

What we have intended to demonstrate by this discussion is not that appellants have failed to cast some doubt upon the reliability (in an absolute sense) of the figures used by the Director of the Census; rather, our point is that however weak the census figures are thought to be, the appellants have been able to offer none better. Their figures are necessarily amalgams of estimates and hypotheses because there are no statistics available which provide what are assuredly completely accurate answers to the questions raised by section 4(b) of the Voting Rights Act. That being so, it is clearly the prerogative of Congress to specify one particular source for all the figures to be used, to insure quick availability and consistency.[46]

---

**42.** Lesko Associates, Final Report: Basic Data and Guidance Required to Implement a Major Illegal Alien Study During Fiscal Year 1976 (October 15, 1975) (prepared for the Office of Planning and Evaluation, United States Immigration and Naturalization Service) [Appendix to Appellants' Supplemental Brief]. Its publication date indicates that this information was not available to the Director prior to the time he made his determinations.

**43.** Obviously *undetected* aliens cannot have been counted. *See Id.* at 12 for a description of the methodology by which the estimates were calculated.

**44.** This is not to say that the Bureau of the Census has been able to count every illegal alien in Texas; many of these people would naturally be afraid to participate in the census-taking. But the figures with which the number of aliens of voting age in Texas would be used [the total population of voting age in Texas on November 1, 1972; the number of registered voters on that same date; and the number of actual voters in the national election held several days thereafter] in making the required determinations are all figures derived from actual counts. For better or worse, the Congress made a decision to use Bureau of Census figures (with all their shortcomings) exclusively,

rather than to mix figures from different sources. *See* note 46 *infra*.

**45.** Appellants' Supp. Brief at 4–5.

**46.** The legislative history of the Voting Rights Act plainly indicates that Congress has made this choice. During the debates on the 1965 Act, it was recognized that one weakness in the use of a mathematical trigger was the fact that it could be manipulated so as to include a particular area under the Act:

[A] great deal depends upon whose source figures you consult. Under some source figures, New York County comes under the bill—under others it does not.

The problem of figures is most complex. Whose figures do you use? And how correct are they? And who is to decide? We have the census figures which are supposedly correct since they are a nose count. But whose nose should you count for the purposes of this bill? The census is designed to enumerate the people—and that means all the people, including citizens, aliens, military personnel, and the dependents of the latter.

111 Cong.Rec. 10859 (May 18, 1965). As is evident from the above-quoted passage, concern was expressed about the reliability of census figures in particular. *See also Hearings on*

■ Having determined that the Bureau of the Census properly looked only to its own statistics for the data needed by the Director to make his determinations, we can go no farther. Under the standard of review which we have previously approved,[47] the court has narrow jurisdiction to consider the correctness of the Director's interpretation of the statute, but not to review his computations. We find that the trial court correctly held "that there has been proper consideration given to the status of aliens in making the computations and that the Director is reasonable in relying on data derived from answers to Census questionnaires."[48] It was right for the district court to consider the sources of the Director's data to the extent that this was necessary to ascertain whether he accurately interpreted his duty under the statute, but no further. Once the district court had concluded that the Director had correctly read the statute to allow him, in his discretion, to rely only on census data, it had exhausted its jurisdiction to review the Director's determinations and properly refused to consider the computations themselves. We, likewise, are without authority to consider the substance of those findings.

■ The second challenge made to the Director's determinations also falls within our narrow subject matter jurisdiction: appellants contend that the Director did not correctly apply that portion of section 4(b) which requires him to determine

> that less than 50 per centum of the persons of voting age were registered on November 1, 1972,
>
> or
>
> that less than 50 per centum of *such persons* voted in the presidential election of November 1972.[49]

The Director's interpretation of that passage, which was approved by the lower court, is that "such persons" means "voting age citizens." Thus, in order for the Act to apply, the Director would have to determine either that (1) less than 50 percent of

*Voting Rights Before the Senate Judiciary Comm.,* 89th Cong., 1st Sess., part 1, at 598 (1965) [hereinafter cited as *Senate Hearings*] (exchange between Sen. Ervin and A. Ross Eckler, Acting Director of the Census). But during the Senate hearings, the use of Civil Rights Commission figures was discussed and apparently rejected because of the limitations of those statistics. *See Senate Hearings, supra* at 596. On the other hand, supporters of the bill such as Sen. Tydings concluded that census figures, though not perfect, were the "best available":

> The population and voting statistics which the Director of the Census will determine under section 4(b) will be based on the most authoritative and reliable information available.
>
> That is the reason why we wrote the section we did in committee. That is the reason why the bill reads as it does. The pending amendment [which would have deleted language similar to that now found in 42 U.S.C. § 1973b(b) (1970) which makes the Director's determinations unreviewable] woud [would] open the door for extensive litigation, questioning the Census Bureau's findings and statistics, which are the best available to us at this time in this country.

111 Cong.Rec. 11470 (May 25, 1965). This view was perhaps best expressed by Sen. Mansfield, who stated:

> Inasmuch as we appropriate money every so often to the Census Bureau for the taking of the census, I believe we must have some faith in the credibility of the Census Bureau. If not, we are wasting money in maintaining that division of the Government.

111 Cong.Rec. 8298 (April 22, 1965). As for the specific allegation that appellants make here—that census figures do not correctly count the number of illegal aliens in Texas—it was specifically recognized during debate on the 1975 Amendments that the Census Bureau does not count illegal aliens. 121 Cong.Rec. H4889 (daily ed. June 4, 1975) (statement of Cong. Badillo).

This is not to say, of course, that the Director of the Census cannot take figures from other sources into account in making his determinations under section 4(b). *See Hearings on Voting Rights Before Subcomm. No. 5 of the House Judiciary Comm.,* 89th Cong., 1st Sess., ser. 2, at 333 (1965) [hereinafter cited as *House Hearings*]. The discretion to do so, however, lies solely with the Director and his choice of sources is not reviewable. 42 U.S.C. § 1973b(b) (1970).

47. *See* text at ———–—— of 175 U.S.App.D.C., at 1263–1265 of 535 F.2d *supra.*

48. App. 224.

49. 42 U.S.C.A. § 1973(b) (1976 Supp.) (emphasis added). *See also* text at ——— of 175 U.S. App.D.C., at 1261 of 535 F.2d *supra.*

the voting age citizens were registered, or (2) that less than 50 percent of the voting age citizens voted.

Appellants contend that such an interpretation would make the first clause superfluous, since the percentage of people voting could never be greater than the percentage of people registered, absent illegal voting by unregistered voters.[50] The correct construction, they argue, is to define "such persons" as meaning "registered voters," thereby requiring the Director to find that either (1) less than 50 percent of the voting age citizens were registered, or (2) that less than 50 percent of those registered had voted, in order for the Act to apply.[51]

At the outset, appellants would seem to have the better argument. It is a rule of statutory construction that legislative enactments be so construed as to give effect to all parts.[52] However, it is also true that a construction of a statute that creates a result contrary to the apparent intent of the legislature should not prevail.[53] In this regard it is noteworthy that if appellants' construction had been used when the Voting Rights Act of 1965 was first applied, many states that the Act was admittedly aimed at would not have been covered.[54] A close look at the legislative history of the Voting Rights Act of 1965, from which the trigger clause was

**50.** Thus, it would never be necessary to determine whether less than 50 percent of the voting age citizens were registered, because (1) if less than 50 percent of the voting age citizens voted, there would be no need to determine whether less than 50 percent were registered; and (2) if greater than 50 percent of the voting age citizens voted, then of necessity greater than 50 percent of the voting age citizens must have been registered.

**51.** Appellants do put forward a second construction which they argue, alternatively, should be preferred over the one adopted by the Director of the Census. Under this interpretation, that portion of the trigger clause which requires the Director to determine the percent of the voting age population which had registered to vote would apply only in states where voters are registered; the second portion of the trigger clause, requiring the Director to determine the percent of the voting age population that voted, would apply only in states that do *not* register voters. Appellants, however, do not quote a single instance of support for this construction in the debates on the Voting Rights Act, and our reading of the entire legislative history reveals none. Moreover, that same history is quite clear on the correct interpretation of this clause. *See* text at —— —— of 175 U.S.App.D.C., at 1272–1276 of 535 F.2d *infra*. Thus we also reject this suggested construction.

**52.** *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–520, 99 L.Ed. 615, 623–624 (1955); 2A C. D. Sands, Sutherland Statutory Construction § 46.06 (4th ed. 1973).

**53.** 2A C. D. Sands, *supra* note 52, at § 46.07. *See also United States v. American Trucking Assn.,* 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345, 1350 (1940).

**54.** The trigger provisions of the 1975 Amendments were carried over from the 1965 Act. In upholding the 1965 Act in *South Carolina v. Katzenbach,* the Supreme Court found:

Congress began work with reliable evidence of actual voting discrimination in a great majority of the States and political subdivisions affected by the new remedies of the Act. The formula eventually evolved to describe these areas was relevant to the problem of voting discrimination, and Congress was therefore entitled to infer a significant danger of the evil in the few remaining States and political subdivisions covered by § 4(b) of the Act.

\* \* \* \* \* \*

To be specific, the new remedies of the Act are imposed on three States—Alabama, Louisiana, and Mississippi—in which federal courts have repeatedly found substantial voting discrimination.[38] Section 4(b) of the Act

[38] House Report 12; Senate Report 9–10.

also embraces two other States—Georgia and South Carolina—plus large portions of a third State—North Carolina—for which there was more fragmentary evidence of recent voting discrimination mainly adduced by the Justice Department and the Civil Rights Commission.[39] All of these areas

[39] Georgia: House Hearings 160–176; Senate Hearings 1182–1184, 1237, 1253, 1300–1301, 1336–1345. North Carolina: Senate Hearings 27–28, 39, 246–248. South Carolina: House Hearings 114–116, 196–201; Senate Hearings 1353–1354.

were appropriately subjected to the new remedies.

383 U.S. 301, 329–30, 86 S.Ct. 803, 819, 15 L.Ed.2d 769, 787 (1966). It is thus clear that

carried over without substantial change,[55] indicates that the Director's interpretation of this clause is indeed the correct one.

The Voting Rights Act of 1965 was conceived of by the Johnson Administration after other efforts to eliminate discrimination in voter registration had proved unsuccessful.[56] As introduced, the Administration's draft bill contained a trigger clause very similar to one which appears in the final 1965 Act and in the 1975 Amendments:

SEC. 3. (a) No person shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device, in any State or in any political subdivision of a State which (1) the Attorney General determines maintained on November 1, 1964, any test or device as a qualification for voting, and with respect to which (2) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964.[57]

See 121 Cong.Rec. H4884–93 (daily ed. June 4, 1975).

**55.** We sought to maintain precisely the same structure that presently exists in the act, and that is the reason that in title II the trigger mechanism that is retained is identical to the mechanism in the 1965 act. That is the principle that the jurisdictions to be covered will be those where less than 50 percent of the persons of voting age were registered to vote or actually voted.

121 Cong.Rec. H4737 (daily ed. June 2, 1975) [statement of Cong. Badillo, a sponsor of the 1975 Amendments and member of the House Judiciary Committee which considered the bill, during floor debate on H.R. 6219, 94th Cong., 1st Sess. (1975), which was enacted as the 1975 Voting Rights Act Amendments, Pub.L. 94–73, 89 Stat. 400 (1975)]. In the only change of substance, the phrase "the Director of the Census determines that less than 50 per centum of the *persons* of voting age residing therein were registered" which appears in the 1965 Act was amended to substitute "citizens" for "persons."

Congress intended Georgia, Louisiana, and South Carolina (among others) to be covered by the 1965 Act. *Yet under the appellants' construction of the trigger clause, those states would not have been covered.* In Georgia in 1964, 63.4 percent of the voting age population registered, 68.2 percent of the registered voters voted, but only 43.3 percent of the voting age population voted; in Louisiana in 1964, 63.5 percent of the voting age population registered, 74.6 percent of the registered voters voted, but only 47.3 percent of the voting age population voted; in South Carolina in 1964, 58.0 percent of the voting age population registered, 67.9 percent of the registered voters voted, but only 39.4 percent of the voting age population voted. App. 127. *Similarly, the Congress clearly contemplated that Texas would be covered by the 1975 Amendments. See* S.Rep. No. 94–295, 94th Cong., 1st Sess. 24–32 (1975); H.R.Rep. No. 94–196, 94th Cong., 1st Sess. 16–22 (1975). Under appellants' construction of this same trigger clause, Texas would not be covered by the 1975 Amendments. *See* Appellants' Brief at 15.

**56.** *See Senate Hearings, supra* note 46, at 8–14 (statement of Attorney General Katzenbach).

**57.** *See Senate Hearings, supra* note 46, at 1 (S.1564); *House Hearings, supra* note 46, at 862 (H.R.6400). Virtually the same language appears as section 4(b) of the final 1965 Act:

(b) The provisions of subsection (a) of this section shall apply in any State or in any political subdivision of a state which (1) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964.

79 Stat. 438 (1965). This language reoccurs with only minor changes as section 202 of the 1975 Amendments:

SEC. 202. Section 4(b) of the Voting Rights Act of 1965 is amended by adding at the end of the first paragraph thereof the following: "On and after August 6, 1975, in addition to any State or political subdivision of a State determined to be subject to subsection (a) pursuant to the previous two sentences, the provisions of subsection (a) shall apply in any State or any political subdivision of a State which (i) the Attorney General determines maintained on November 1, 1972, any test or device, and with respect to which (ii) the Director of the Census determines that less than 50 per centum of the citizens of voting age were registered on November 1, 1972, or that less than 50 per centum of such persons voted in the Presidential election of November 1972".

89 Stat. 401 (1975).

During the Senate hearing on this bill, Senator Edward M. Kennedy questioned Attorney General, Katzenbach, representing the Administration, about the meaning of "such persons":

Senator KENNEDY. Touching on an area where there might be some ambiguity, section 3(a)(2) states that the Director of Census is to determine "that less than 50 percentum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 percentum of such persons voted in the presidential election of November 1964." Pertaining to the last clause of that language . . . does the term "such persons," refer to people in the State who were registered to vote, or people in the State of voting age?

Attorney General KATZENBACH. Persons in the State of voting age residing therein, Senator, not those registered. Presumably, normally, people have to be registered to vote. But the reference here would be simply to persons residing therein of voting age.[58]

This interpretation was confirmed several days thereafter, in a colloquy between Senator Ervin and A. Ross Eckler, Acting Director of the Census, about Eckler's interpretation of the trigger clause:

Mr. ECKLER. Well, Senator Ervin, it would seem to us as we study this bill that although both registration and voting are mentioned, it is not necessary to assemble the registration figures since the registration figures would always be higher than the vote cast figures.

Senator ERVIN. Yes, sir. That is true.

Mr. ECKLER. Therefore, if a place, a political subdivision, or a State failed to qualify, failed to be under 50 percent on the voting criteria, it could not possibly qualify under 50 percent on the registration criteria. So it seems to us that it is not necessary for us to undertake the assembly of information on registration.

Senator ERVIN. And yet how are you going to make a certification? The bill provides that the Bureau of the Director of the Census must determine that less than 50 percent of the persons of voting age residing therein were registered on November 1, 1964. To comply with this law, you would have to do it, would you not?

Mr. ECKLER. I do not interpret, Senator Ervin, that we need to determine that they were—the wording of the legislation is that 50 percent were registered or voted. Now, if we determine, if we concentrate on the counties in which less than 50 percent voted, it seems to me impossible that we would miss any in which the percentage would be, of the registrants would be less than 50.

Senator ERVIN. Yes, sir, but that is not what the statute says the Director of the Census should do. It says the Director of the Census must determine whether less than 50 percent of the people of voting age residing therein were registered on November 1, 1964.

Mr. ECKLER. If I may comment, Senator Ervin, that is not the end of the sentence.

Senator ERVIN. No, but there is an "or" there. That is one of the things you have to certify and then you have to certify in an alternative proposition.

Mr. ECKLER. I suppose that this is something for the Attorney General to give advice on. But I certainly have worked on the assumption that we do not need to do both of these tasks, that the objective of the bill is to identify counties which meet a certain criteria.

Senator ERVIN. The Director of the Census has to determine two things. The first is that less than 50 percent of the persons of voting age residing in a particular State or political subdivision were registered on November 1, 1964. In other words, they want to catch them either way. If 100 percent were registered without discrimination, they want to catch a county or a State under the second section. If more than 50 percent, or as much as 50 percent were not regis-

**58.** *Senate Hearings, supra* note 46, at 162.

tered, they want to catch them under the other section. It will catch them on either horn.

\* \* \* \* \* \*

Mr. ECKLER. [T]here could be no State which would qualify for the registration only. If it qualifies for the registration, it must, without any doubt, qualify under the voting criteria. Therefore, it seems to me that we do not need to address ourselves at all to the registration figures, that the voting figures give us completely responsive answers to our duties under this bill.

\* \* \* \* \* \*

Senator ERVIN. So under the interpretation you placed as to the primary objective of the bill, a State could register 100 percent of its adult population without any discrimination and still be brought under this bill if less than 50 percent of that 100 percent went out to vote?

Mr. ECKLER. That is my interpretation of the bill, Senator.

\* \* \* \* \* \*

Senator DIRKSEN. May I interpose?

Senator ERVIN. Yes.

Senator DIRKSEN. Mr. Eckler, of course, all that is of no concern of yours. You are not a policy-making body. You are a statistical factfinding body and you do not have to be bothered about the two horns of this dilemma or this Texas steer. You either ascertain whether less than 50 percent registered or less than 50 percent voted. That is all you have to do. Whatever your views may be on policy would be of no concern so far as this bill is concerned, and certainly would be of no concern to the Census Bureau.

Mr. ECKLER. That is correct.

Senator ERVIN. In other words, you and the Senator from Illinois agree that the Director of the Census does not need to determine that less than 50 percent of the persons of voting age residing in an area were registered in 1964.

Mr. ECKLER. I am sorry, I did not understand the question.

Senator ERVIN. In other words, you agree with the Senator from Illinois who says that there is no need to pay attention to the provision of this bill which say the Director of the Census is to determine that less than 50 percent of the people of voting age resided in a particular State or particular subdivision registered on November 1, 1964.

Mr. ECKLER. I think my conclusion is that the phrase as a whole needs to be looked at, part 2, which has this or this, and that the criterion determined by either one is what we concern ourselves with.

Senator ERVIN. The Bureau of the Census is not prepared to make any certification at all on the first alternative, is it?

Mr. ECKLER. The first alternative, if we had to do that, we do not have the figures available. They are in some cases not available anywhere as far as I know.[59]

At this point, Senator Ervin raised the very argument upon which appellants primarily rely:

Senator ERVIN. So we might as well for all practical purposes strike that provision out of the act.

Mr. ECKLER. There may be some other provision that it serves. For the purpose of our statistics, I do not see any reason for it.

Senator ERVIN. Yes.[60]

Several minutes later, Senator Kennedy offered a rationale for including both tests:

Senator KENNEDY. I had just one very brief question, just for clarification, on this section 3(a), which charges your responsibility, Mr. Eckler.

I can see a possibility wherein that first phrase of section 2, where it says the Director of the Census determines that less than 50 percent of the people of

---

**59.** *Id.* at 599–601.

**60.** *Id.* at 601.

voting age residing therein were registered on November 1, 1964, you might have 100 people or 1,000 people and you might have 75 percent of those people which would be registered as of that date. Then that would mean that the aspect of the trigger would not work, but if less than 50 percent of those people actually voted in the presidential election, then the trigger would work. In effect, then, there is an interrelationship in this. It is certainly my feeling that legislation which is directed toward the purpose in mind of registration, such a trigger certainly makes sense and is an important aspect of this legislation.

So I can understand, at least to some extent, that it is somewhat clearer as to what the responsibilities are.[61]

Although there is no indication that Sen. Kennedy's rationale was adopted by the committee, both determinations were still required by section 4(b) of the bill as it was reported out of committee.[62] Appendix L of the Senate Report contains tables which clearly demonstrate that the number of persons voting is to be compared to the total voting age population, and not to the number of registered voters.[63]

During the ensuing floor debate on S.1564, the trigger clause was given the same interpretation as it had been given in committee:

> Because it seems unlikely, *if not impossible,* that a person could vote in the November 1964 presidential election who was not registered on November 1, 1964, for practical purposes, the criterion is that a State will have its voter qualification tests suspended if less than a fifth of the persons of the voting age were not white [*see* note 62 *supra*] and less than half of them voted in the 1964 presidential election.[64]

Although the meaning of this clause was specifically discussed at no other point during either the House or Senate debates on the 1965 Act, many senators and congressmen indicated by their references to the trigger section that they interpreted it to mean that the Director was required to determine that less than 50 percent of the persons of voting age had registered *or* voted.[65] An amendment that would have

---

61. *Id.* at 604–05.

62. *See* S.Rep.No.89–162, 89th Cong., 1st Sess. 22–23 (1965); 111 Cong.Rec. 7802 (April 13, 1965) [S.1564]. *See also* H.R.Rep.No.89–439, 89th Cong., 1st Sess. 2 (1965) [H.R.6400], U.S. Code Cong. & Admin.News 1965, p. 2437. The Senate bill at this stage contained a third trigger requirement, that the Director of the Census determine whether more than 20 percent of the persons of voting age in the particular jurisdiction were nonwhite. This requirement was eliminated in conference. *See* H.R.Rep. No.89–711, 89th Cong., 1st Sess. 12 (1965), U.S.Code Cong. & Admin.News 1965, p. 2437.

63. S.Rep.No.89–162, 89th Cong., 1st Sess. 52–53 (1965), U.S.Code Cong. & Admin.News 1965, p. 2437. See also *Senate Hearings, supra* note 46, at 80; *House Hearings, supra* note 46, at 29.

64. 111 Cong.Rec. 11079 (May 20, 1965) (statement of Sen. Eastland).

65. *See, e. g.,* statement of Cong. Adams, 111 Cong.Rec. 15993 (July 8, 1965); statement of Cong. Anderson, 111 Cong.Rec. 15640 (July 6, 1965); statement of Cong. Ashmore, 111 Cong. Rec. 15731 (July 7, 1965); statement of Cong. Buchanan, 111 Cong.Rec. 16009, 16010 (July 8, 1965); statement of Cong. Callaway, 111 Cong. Rec. 15722 (July 7, 1965); statement of Cong. Celler, 111 Cong.Rec. 15645, 15647 (July 6, 1965); statement of Cong. Edwards, 111 Cong. Rec. 16222 (July 9, 1965); statement of Cong. Farbstein, 111 Cong.Rec. 15717 (July 6, 1965); statement of Cong. Lennon, 111 Cong.Rec. 16234 (July 9, 1965); statement of Cong. Martin, 111 Cong.Rec. 16019 (July 8, 1965); statement of Cong. McClory, 111 Cong.Rec. 15662 (July 6, 1965); statement of Cong. McGregor, 111 Cong.Rec. 16017 (July 8, 1965); statement of Cong. Poff, 111 Cong.Rec. 16217 (July 9, 1965); statement of Cong. Rivers, 111 Cong. Rec. 16025 (July 8, 1965); statement of Cong. Rodino, 111 Cong.Rec. 15660 (July 6, 1965); statement of Cong. Rogers, 111 Cong.Rec. 15998 (July 8, 1965); statement of Cong. Smith, 111 Cong.Rec. 15639 (July 6, 1965); statement of Cong. Selden, 111 Cong.Rec. 16014 (July 8, 1965); statement of Cong. Weltner, 111 Cong.Rec. 16270 (July 9, 1965); statement of Cong. Widnall, 111 Cong.Rec. 16223 (July 9, 1965); statement of Cong. Willis, 111 Cong.Rec. 15657 (July 6, 1965); statement of Sen. Bayh, 111 Cong.Rec. 8467 (April 26, 1965); statement of Sen. Eastland, 111 Cong.Rec. 11079 (May 20, 1965); statement of Sen. Ellender, 111 Cong.Rec. 10744 (May 17, 1965); statements of Sen. Ervin, 111 Cong.Rec. 8303

eliminated that language in the clause which requires the Director to determine that 50 percent of "such persons" had voted (thereby leaving only the determination that 50 percent of the voting age population was registered) was rejected without discussion about the construction of the entire trigger clause.[66]

Consistent with this expressed legislative intent, both the United States Commission on Civil Rights[67] and the United States Supreme Court[68] have adopted an interpretation of the trigger clause which requires the Director of the Census to determine whether registration *and* voter turnout in the 1964 Presidential election was less than 50 percent *of the voting age population.* The legislative history of the 1975 Amendments, though containing few references to the meaning of the trigger clause, also appears to support the forgoing construction.[69]

It is therefore clear that the interpretation given to the trigger clause by the Director of the Census is the correct one, although it is not the one that would appear at first blush from a normal reading of the language. It is, however, the construction that is clearly required by the unquestioned interpretation given the clause during its passage through the legislative process. We thus reject the second challenge to the Director's determinations also.

## IV.

Finally, appellants challenge the determination by the Attorney General under section 4(b) that Texas maintained a "test or device"—*i. e.,* English-only elections—on November 1, 1972. Their argument on this point asserts that section 4(d) of the amended Act modifies section 4(b). Section 4(d) provides:

> ber 1, 1964, *or voted* in the presidential election of November 1964.
>
> *South Carolina v. Katzenbach,* 383 U.S. 301, 317, 86 S.Ct. 803, 812, 15 L.Ed.2d 769, 780 (1966) (emphasis added). *See also Gaston County v. United States,* 395 U.S. 285, 286, 89 S.Ct. 1720, 23 L.Ed.2d 309, 311 (1969).

(April 22, 1965), 111 Cong.Rec. 9793, 9794 (May 6, 1965); statements of Sen. Hart, 111 Cong.Rec. 8301 (April 22, 1965), 111 Cong.Rec. 9795 (May 6, 1965); statement of Sen. Mansfield, 111 Cong.Rec. 8297 (April 22, 1965); statement of Sen. Talmadge, 111 Cong.Rec. 9079 (April 30, 1965); statements of Sen. Thurmond, 111 Cong.Rec. 11115 (May 20, 1965), 111 Cong.Rec. 11471 (May 25, 1965). *But see* statement of Sen. Ellender, 111 Cong.Rec. 8297 (April 22, 1965); statement of Sen. Ervin, 111 Cong.Rec. 9775, 9786 (May 6, 1965); statement of Sen. Tydings, 111 Cong.Rec. 11471 (May 25, 1965).

66. 111 Cong.Rec. 11470–72 (May 25, 1965). The amendment was proposed by Sen. Ervin:

   The PRESIDING OFFICER. The clerk will state the amendment.

   The CHIEF CLERK. On page 6, lines 7, 8, and 9, strike out the words "or that less than 50 per centum of such persons voted in the presidential election of November 1964."

   Mr. ERVIN. Mr. President, the amendment would strike from the triggering process the provision which is based upon the fact that less than 50 percent of the persons of voting age in a State or county voted in the presidential election of 1964.

   *Id.* at 11470.

67. United States Commission on Civil Rights, The Voting Rights Act: Ten Years After 5 (Jan. 1975).

68. [T]he Director of the Census has determined that less than 50% of [South Carolina's] voting-age residents were registered on Novem-

69. *See, e. g.,* statements of Cong. Badillo, 121 Cong.Rec. H4738 (daily ed. June 2, 1975), 121 Cong.Rec. H4888 (daily ed. June 4, 1975); statement of Cong. Clay, 121 Cong.Rec. H4756 (daily ed. June 2, 1975); statement of Cong. Edwards, 121 Cong.Rec. H4713, H4716 (daily ed. June 2, 1975); statement of Cong. Kindness, 121 Cong.Rec. H4819 (daily ed. June 3, 1975); statement of Cong. Talcott, 121 Cong. Rec. H4891 (daily ed. June 4, 1975); statement of Cong. Wiggins, 121 Cong.Rec. H4741 (daily ed. June 2, 1975); statement of Sen. Talmadge, 121 Cong.Rec. S13357 (daily ed. July 22, 1975); statement of Sen. Thurmond, 121 Cong.Rec. S13664 (daily ed. July 24, 1975). *But see* statement of Sen. Domenici, 121 Cong.Rec. S13657 (daily ed. July 24, 1975); statements of Sen. Thurmond, 121 Cong.Rec. S13362 (daily ed. July 22, 1975), 121 Cong.Rec. S13593 (daily ed. July 24, 1975). During the debate on the 1975 Amendments, a proposal to delete the requirement that the Director of the Census determine whether less than 50 per cent of the voting age population registered to vote was defeated without discussion of the construction of the entire trigger clause. *See* 121 Cong.Rec. H4797–4806 (daily ed. June 3, 1975).

For purposes of this section no State or political subdivision shall be determined to have engaged in the use of tests or devices *for the purpose or with the effect of denying or abridging the right to vote* . . . if (1) incidents of such use have been few in number and have been promptly and effectively corrected by State or local action, (2) the continuing effect of such incidents has been eliminated, and (3) there is no reasonable probability of their recurrence in the future.

42 U.S.C.A. § 1973b(d) (1976 Supp.) (emphasis added). The Texas claim that its election practices are not covered by the amended Act is based upon the fact that its state legislature enacted a bilingual election law which became effective on May 16, 1975,[70] and which has corrected the effect of English-only elections and allows a finding under section 4(d) that there is "no reasonable probability" of such English-only elections recurring in the future.

At the time of the hearing in the trial court, the Attorney General had not yet determined under section 4(b) whether Texas "maintained on November 1, 1972, any test or device," so the trial court refused to consider this issue on the ground that it was not ripe for adjudication.[71] However, the Attorney General has subsequently made that determination,[72] and to require a new lawsuit to adjudicate its validity would work a great hardship on the parties and constitute a waste of judicial energy.[73] Because we view this issue as purely one of law, we believe that it can be decided on appeal without the benefit of any further record.[74]

Appellants err in their contention that section 4(d) applies to the determinations made by the Attorney General under section 4(b). The plain language of section 4(d) makes it applicable to determinations as to whether a state "engaged in the use of tests or devices *for the purpose or with the effect* of denying or abridging the right to vote." [75] Section 4(d) goes on to state three tests which, if proved in a lawsuit, will support a finding that the state has not used tests or devices in the prohibited manner. The above-quoted language has reference to the wording of section 4(a), which provides that in order for a state to *terminate* its coverage under the Voting Rights Act, the state must bring an action in the United States District Court for the District of Columbia and secure a declaration by that court "that no such test or device has been used during the ten years preceding the filing of the action *for the purpose or with the effect* of denying or abridging the right to vote." [76] In the entire Voting Rights Act, as amended, *only* section 4(a) requires a determination that a state has not used tests or devices "for the purpose or with the effect" of denying or abridging the right to vote. Therefore, it is only in a *judicial* termination proceeding under that section that section 4(d) has any application or becomes relevant. *South Carolina v. Katzenbach,* 383 U.S. 301, 332, 86 S.Ct. 803, 820, 15 L.Ed.2d 769, 789 (1966). The same point is buttressed by H.R.Rep.No.89–439, 89th Cong., 1st Sess. 26 (1965), U.S.Code Cong. & Admin.News 1965, p. 2457 which states:

> [Subsection 4(d)] clarifies the burden of proof required of a State or political subdivision *to resume use of tests or devices in those situations where resumption would not be precluded because of the existence of a final judgment as described in the proviso to subsection 4(a).* This

---

**70.** Tex.Acts 1975, 64th Leg., page 511, ch. 213, § 1, *codified as* 9 Tex.Civ.Stat.Ann. § 1.08a (1976 Supp.).

**71.** App. 224.

**72.** *See* note 18 *supra.*

**73.** *See Toilet Goods Assn. v. Gardner,* 387 U.S. 158, 162, 87 S.Ct. 1520, 1523, 18 L.Ed.2d 697, 701 (1967).

**74.** *United States v. Jones,* 174 U.S.App.D.C. 34, 36, 527 F.2d 817, 819 (1975).

**75.** 42 U.S.C.A. § 1973b(d) (1976 Supp.).

**76.** *Id.* at § 1973b(a).

subsection provides that a State or political subdivision, not barred from relief under the proviso to subsection 4(a), shall not be determined to have engaged in the use of tests or devices for the purpose or with the effect of denying or abridging the right to vote on account of race or color if [the jurisdiction can prove that the three subparts of § 4(d) apply]. A promise not to violate the law would not meet the test of this subsection.

(Emphasis added.)

Thus, because section 4(b) only requires the Attorney General to determine whether any test or device was being *maintained* on a certain date in the past, and does not provide for him to make the further determination that the test or device was used "for the purpose or with the effect of denying or abridging the right to vote," section 4(d) is by its terms inapplicable to his action under section 4(b). The standard which section 4(d) sets out is only compatible with the action the *court* is required to take in a lawsuit under section 4(a). If Texas believes that it is entitled to be excluded from coverage under the Voting Rights Act because of compliance with section 4(d), it must bring the required action in the District Court for the District of Columbia, which has the exclusive power to determine compliance with that section's standard for termination.

We accordingly find appellants' argument on this point unpersuasive.

### CONCLUSION

In summary, insofar as we have jurisdiction to consider the matter we find that the Attorney General and the Director of the Census have acted properly in carrying out their mandate under the 1975 Amendments to the Voting Rights Act, and we affirm the district court in its grant of summary judgment to the appellees-defendants.

*Judgment accordingly.*