Wallace REED et al., Appellees,

v.

Rogers C. B. MORTON, Secretary of the Interior, et al., Appellants,

UNITED STATES of America, Appellant,

v.

HOOD CORPORATION et al., Appellees.

Nos. 71–1187, 71–1188.

United States Court of Appeals, Ninth Circuit.

June 4, 1973.

As amended on Denial of Rehearing July 27, 1973.

Jacques B. Gelin (argued), Shiro Kashiwa, Asst. Atty. Gen., Sidney E. Smith, U. S. Atty., Dept. of Justice, Washington, D. C., Sherman F. Furey, Jr., U. S. Atty., Boise, Idaho, Edmund B. Clark, Arthur D. Smith, Dept. of Justice, Washington, D. C., for appellant.

Dennis M. Olsen (argued), of Petersen, Moss & Olsen, Idaho Falls, Idaho, Alan R. Woodard (argued), of Kadison, Pfaelzer, Woodard & Quinn, Los Angeles, Cal., Alfred C. Kiser, Boise, Idaho, for appellees.

Before BROWNING, DUNIWAY, and GOODWIN, Circuit Judges.

ALFRED T. GOODWIN, Circuit Judge:

The United States appeals from two judgments in related litigation, approving the acquisition and development of 3,700 acres of public land in Idaho.

The first action was brought by Wallace Reed and others to set aside an administrative decision of the Secretary of Interior canceling seven individual entries filed under the Desert Land Act of 1877, as amended, 43 U.S.C. §§ 321–339.[1]

The second action was brought by the government to cancel five patents grant-

1. Chapter 9 of Title 43 of the U.S.Code, 43 U.S.C. §§ 321–39, comprises the statutory framework by which individuals may acquire title from the United States to limited tracts of desert lands. Section 322 defines desert lands. Section 321 instructs the Secretary of the Interior to issue patents for up to 320 acres of desert land to a citizen who pays 25 cents per acre and files a declaration of intent to irrigate the land, and pays an additional dollar per acre and makes satisfactory proof of reclamation within three years of filing the declaration of intent. Under section 328 an entryman must prove he has expended at least $3 per acre for water rights and irrigation and that he has cultivated one-eighth of the land. Section 324 forbids assignment of land "to or for the benefit of any corporation or association."

ed to persons participating with the Reed group in acquiring the public lands in a manner the government contends was in violation of the Desert Land Act.

The district court held in the first action that the Secretary was wrong in canceling the seven entries that had not yet ripened into patents. In the second action it held that the five patents were free from fraud or mistake. We reverse both judgments.

I

The relevant facts apply to both cases. In January and February of 1961, Reed, a farm-equipment dealer, and Raymond Michener, an agricultural engineer, recruited friends and relatives who, with themselves, filed twelve entries upon government land available for entry under the Desert Land Act. Reed and Michener contemporaneously purchased from the State of Idaho a section of state-owned land that was contiguous with parts of the twelve tracts for which desert-land applications had been filed.

On March 7, 1961, Reed and Michener organized a non-profit corporation known as Indian Hill Irrigation Company, and assumed the titles of officers of the corporation. There was no election of officers, shareholders' meeting, or payment for subscribed stock.

When Reed and Michener originally conceived their plan for the 3,700 acres, they had hoped to defray the substantial costs of irrigation and development by a Bureau of Reclamation Small Projects loan. In the fall of 1962, prospects for the government loan did not appear to be good, and Reed and Michener approached the Travelers Insurance Company for a private loan with which to begin development. Travelers insisted that before it would make the requested loans it would require first mortgages on Reed and Michener's state section and on Reed's ranch, 1,000 acres of the project to be under irrigation, two entries to be processed to the point that

they could be patented, and a lessee acceptable to Travelers who would operate the entire project as a farm. Under these conditions, the proposed Travelers loan could not meet the project's need for immediate funds.

Reed and Michener entered into a five-year lease with A. J. Jolley and G. A. Masterson. The lease divided the anticipated farm proceeds among the named parties and gave the lessees an option to buy the land.[2] There was no provision for the other entrymen to receive anything, and there is no evidence that any entryman other than Reed and Michener participated in the lease negotiations.

On February 12, 1963, Reed and Michener called a meeting of the entrymen and informed them that because of a shortage of capital caused by the failure of the anticipated loans to materialize each entryman would either have to pay to Reed and Michener $983 in cash and assume a personal obligation of between $12,000 and $14,000, or sign a long-term lease with and turn over development of the project to Indian Hill Irrigation Company. Six days later, all the entrymen except Reed and Michener entered into a twenty-year "lease and development contract" with Indian Hill, and signed notes and mortgages for $300 per acre payable on demand to secure the payments that would fall due under the lease. These notes were secured only by the mortgages on the entry lands, and were not the personal obligations of the entrymen. Indian Hill agreed to bear all expenses and retain all profits.

There was testimony by two of the entrymen that it was understood at the February meeting that in turning over development of the project to Indian Hill the entrymen were giving up all their rights in the land, but would receive $10 per acre after their entries ripened into patents. The developers deny that any such understanding existed.

Two entrymen elected to drop out of the project in February 1963, and sold

2. Jolley and Masterson later sublet to others.

their interests for $5.00 an acre to Charles Shearman. Shearman was a part owner of Hood Corporation, a firm that installed gas pipelines to furnish power for irrigation pumps. Hood Corporation was, in early 1963, furnishing goods and services to the project, and Shearman became interested in the project as an investment.

By July of 1963, Hood Corporation had about $250,000 invested in the irrigation equipment in the Indian Hill project, and observed with increasing concern that the project was losing money. The original developers, Reed and Michener, were also discouraged and wanted to sell out. Shearman, however, was still enthusiastic, but wanted a free hand in developing the land. Shearman, Reed, and Michener met and reached an agreement. The agreement was memorialized in this somewhat cryptic handwritten memorandum, described in the record as G–115:

```
"4500 Ac. a 50 .................225,000
Payoffs ......................... 25,000
200,000 ........... Total Price
  5,000 .......... down
 25,000 .......... when agreements signed
 30,000 .......... when 1st 1200 Ac. proven
 70,000 .......... when 3300 Ac. proven
 70,000 .......... when 5 years"
```

During the summer of 1963 Hood's attorney prepared documents to bring about Shearman's objective of present security for money advanced and eventual acquisition of title to the lands in the project. For this purpose, Shearman formed a subsidiary of Hood, called Hoodco Farms. The attorney also completed the paper work that had been neglected when the Indian Hill corporation had been organized.

By an agreement dated August 15, 1963, superseding the February 18, 1963, agreement with Indian Hill, each entryman gave a nonrecourse promissory note to Hoodco Farms for $200 for each irrigable acre in his entry. Each note was secured by a second mortgage on the maker's entry. First mortgages and similar notes for $100 per acre were given to Indian Hill. Each entryman surrendered possession to Hoodco for a period of twenty years. All stock of Indian Hill was pledged to Hoodco. Hoodco's attorney also prepared an offer to each entryman, except Reed and Michener, to purchase after patent the entryman's land and his stock in Indian Hill for $10.00 an acre. By a separate agreement, Reed and Michener were to receive $197,200, to be paid as Hoodco obtained title to the project. A separate offer of $2,800 for title was given to Reed's mother. All documents except the $10 per acre offers to the entrymen were presented to the entrymen in packets. The entrymen signed the papers, in most cases without reading them, and received no copies.

Hoodco assumed complete control of the project, and in September 1963 submitted final proofs to the land office. When the land office requested evidence of the entrymen's stock ownership in Indian Hill, Hoodco's attorney prepared stock certificates that purported to be "fully paid and nonassessable," although payments had never been made.

Between August 1963 and August 1964, Hoodco completed the irrigation system and the clearing of the land, at a cost of more than $1,000,000, or some $243 per acre.

On November 14, 1963, Jolley, one of the original lessees, reported to the Land Office that Reed and Michener had agreed with Shearman to sell the patents for $250,000. The following March, Shearman died in an airplane accident, and Virginia Agricultural Co. assumed control of the project.[3]

On July 2, 1964, the State Director of the Bureau of Land Management ordered a contest of the entries on a stipulated record. The record, prepared by attorneys for the entrymen, did not re-

---

3. After Shearman's death, Shearman's business partner in Hood, Bernard Laulhere, interested Harvey Proctor, an officer of the Southern California Gas Co., in the land development. Proctor owned the Virginia Agricultural Company.

veal the offers by Hoodco, the memorandum G–115, or the various "understandings" about transfer of the property. The record did include the formal contracts, the stock-pledge agreement, and a concession by Hoodco that the Indian Hill stock was not fully paid. The stipulation also included a proposed "supplemental agreement * * * designed to make it clear that whenever an entryman paid off in cash what he owed, or assumed his proportionate share of the long term financing, he could obtain possession of his entry."

On August 14, 1964, the State Director of the Bureau of Land Management dismissed the contest as to all entries but the Shearmans.'

On September 3, 1964, patents were issued to Wallace Reed, Myrtle Reed, Joseph Nielsen, Robert Schwarze, and George Crapo. These patents were delivered to Reed or Michener, recorded at Hoodco's expense, and never returned to the putative patentees.

On September 4, 1964, the Director dismissed the contest as to the entries of the Shearmans. Thereafter the remaining entrymen submitted final proof papers.

On January 19, 1965, each of the patentees executed an option agreement and deed of his entry to Virginia Agricultural. Each option agreement granted Virginia Agricultural the option of purchasing the patentee's land for $10 an acre, subject to the agreements and notes with Indian Hill and Hoodco.

On January 22, 1965, Reed and Michener entered into a new agreement with Hoodco Farms. Hoodco agreed to pay Reed and Michener $17,419.17 for delivery to Virginia Agricultural of $10-per-acre options on the entries of the five patentees, $24,386.33 for delivery to Virginia Agricultural of $10-per-acre options on entries of the other five original entrymen plus the Shearman entries, $56,000 after obtaining these entries, $29,596.80 for delivery of $10 options on entries known as the Blackwell, Hougen, and Nielsen entries (the July 1963 entrymen), and a bonus of $1,300 for the Hougen and Nielsen entries. The total payment was to be $128,702.30.

On March 9, 1965, the Solicitor of the Department of the Interior, in response to a request for information from the Secretary, advised the Secretary that it was error to decide the Indian Hill contests on a stipulated record and that the long-term lease and security arrangements violated the Desert Land Act. The Secretary set aside the Director's decision as to the seven as yet unpatented entries, and ordered the matter reopened.

On May 25, 1966, the Secretary's chief hearing examiner made findings against the entries. He found a lack of good-faith intent to reclaim at the time of entry and sufficient fraud to vitiate the entries. He found that the contracts and notes with Hoodco were assignments for the benefit of a corporation,[4] that Hoodco held in excess of 320 acres,[5] and that the entrymen had not spent $3.00 an acre.[6] The examiner also found that the system as Hoodco built it could not be farmed in individual units because of the lack of access roads and water-measuring devices, and that conversion to farming by individual units would not have been economically feasible.[7] The

---

4. Such assignments are prohibited by 43 U.S.C. § 324. *See* note 1 *supra.*

5. The statute allows a maximum of 320 acres to be claimed by an entryman. *See* note 1 *supra;* 43 U.S.C. § 329.

6. An entryman must expend at least $3 per acre for water rights and irrigation in order to perfect his claim. *See* note 1 *supra.*

7. The examiner relied on the form of development for two points. First, he saw it as evidence that Hoodco had planned from the beginning to retain possession of the lands. Second, he noted that unitary development created a major obstacle to any entryman's actually repaying Hoodco and regaining his lands.

The parties agree that the entries as developed could not be farmed as units,

Secretary of the Interior, as noted, concluded that the examiner was right.

The United States sued to eject the patentees. Hoodco sued to invalidate the Secretary's May 1966 decision canceling the entries. The cases were consolidated for trial, and on July 10, 1970, the district court found in favor of Hoodco on all points in both actions.

## II

The detailed findings of fact were prepared by Hoodco, after the district court filed a memorandum finding generally in Hoodco's favor. Despite the great weight to be accorded findings made by a trier of fact upon disputed contentions of fact, we cannot escape the conclusion that the district court here gave undue weight to the substantial investment of Hoodco in developing the lands. The court erroneously estopped the government from asserting valid legal grounds for setting aside the fraudulent transactions by which Hoodco acquired the lands in question.

The district court's conclusion that the entrymen had the requisite intent to develop the land at the time patent issued was clearly erroneous. The district court's conclusion that there was no "substantial evidence" of fraud or impropriety in the administrative record is also in error.

The evidence is virtually conclusive that the entrymen abandoned all hope and intent to develop at the time of the February 12, 1963, meeting, and agreed at that meeting to transfer the project to others.

The $10 per acre which some of the entrymen testified that they understood they would receive if they turned over the project to the developers pervades the documentary evidence. The $25,000 in "payoffs" mentioned in G–115 works out to almost exactly $10 per acre for the noncontracting entrymen. The offers prepared by Hoodco's attorney in the summer of 1963 were for $10 per acre. The final agreements signed by the entrymen provided that they would receive $10 per acre for their entries. These agreements were prepared by Hoodco and signed by the entrymen without negotiation or consultation.

Hoodco has not explained its unilateral dealings with the entrymen nor the meaning of the memorandum G–115. The document, by its own terms, purports to memorialize terms of a sale of the land for $200,000 by the developers. Such a secret sale before patent is wholly illegal, and, unless explained, is almost conclusive evidence of a fraud upon the government. *See* United States v. Keitel, 211 U.S. 370, 29 S.Ct. 123, 53 L.Ed. 230 (1908).

However, Hoodco asserts that the $200,000 was to pay for the engineering studies and other services and property the developers had provided. But the developers' own estimates of the value of these items establish that the $200,000 was an unreasonable and highly improbable payment. Furthermore, Hoodco's theory does not explain the "payoffs" mentioned in the document G–115. Although two of the three parties to the contract and the attorney who helped prepare the document were available to testify, no one offered an alternative explanation.

Moreover, additional evidence that G–115 was a contract for the sale of land is found in the August 1963 offers to the Reeds and to Michener and in the January 22, 1965, agreement of Reed and

---

but they disagree as to whether conversion to small-farm operation was economically feasible. An entryman would have had to pay $96,000 to regain bare possession of a 320-acre entry. He would then have been faced with an irrigation company, Indian Hill, controlled by outsiders, and with the necessity of purchasing or renting from another company, Hoodco, the part of the irrigation system owned by it. The need to perform extensive modifications of the system to permit individual farming would present the ultimate obstacle.

Thus, the examiner concluded that the entrymen had neither the ability nor the intent to pursue individual farming operations.

Michener with Hoodco Farms. The 1963 offers show that $200,000 was to be paid for obtaining title to the land. The sums promised under the 1965 agreement also totaled, with adjustments, $200,000.[8] Although these sums were purportedly for obtaining options to the land after patents issued, options and deeds had been obtained three days earlier from those entrymen holding patents.

In addition, the entrymen themselves, after the February 12, 1963, meeting, did not behave as if they had any interest in the land. They signed without discussion or dissent the August 15, 1963, agreements which made it practically impossible for them ever to regain possession of the land. The entrymen received no copies of the documents they had signed, in most cases, without reading. They did not protest when Hoodco developed the land in such a way that it could not be farmed in individual units. The entrymen exhibited no curiosity when, upon issuance, the patents were delivered to and recorded by Hoodco Farms, although the patentees were the ostensible titleholders. At the time of the final "sale" the patentees entered into no meaningful negotiations with the purchasers.

Upon this record, we must conclude that the entrymen understood at the February 12, 1963, meeting that they were transferring their interests to the developers for $10 an acre, and that they did not regard themselves as having any interest in the land after this meeting. Similarly, the developers secretly agreed

in the July 1963 meeting to sell the title to the land to Shearman. In this case, as in Jones v. United States, 258 U.S. 40, 48, 42 S.Ct. 218, 220, 66 L.Ed. 453 (1922) (Holmes, J.), "it is evident * * * that all hands proceeded on the notion that if the entrymen put in a periodical appearance on the land they would get it, and that no one troubled himself about actual intent provided that the affidavits were in due form * * *."

Hoodco argues nonetheless that it is entitled to the land. Hoodco asserts that the understanding in 1963 between the entrymen and the developers that the entrymen would sell their land for $10 an acre is irrelevant, that the secret contract with Shearman to sell the land to him is irrelevant, and that the fact that these arrangements were concealed from the Bureau of Land Management is also irrelevant. Such an argument defies reality.

Hoodco relies on a series of cases which held that under the Timber Culture Act, June 14, 1878, ch. 190, 20 Stat. 113, or the Timber and Stone Act, June 3, 1878, ch. 151, 20 Stat. 89, the Land Department could not require an entryman to swear at the time of final proof that he was not acting for another and could not prevent an entryman from making an executory contract to sell his land after patent. Adams v. Church, 193 U.S. 510, 24 S.Ct. 512, 48 L.Ed. 769 (1904); Williamson v. United States, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278 (1908); United States v. Biggs, 211 U. S. 507, 29 S.Ct. 181, 53 L.Ed. 305

---

8. These payments relate to the G-115 exhibit as follows:

| | |
|---|---|
| January 22, 1965, payment | $128,702.30 |
| Offers to Reed and Micheners on own patents at $10/acre | 11,200.00 |
| Advance to Reed and Michener in October 1964 | 10,000.00 |
| Crop loss | 19,897.70 |
| Loan | 1,500.00 |
| Price of Section 16 (from G-415, a handwritten memo of Michener | 30,000.00 |
| Total | $201,300.00 |
| Less: "Bonus" (from G-415, handwritten memo of Michener) | 1,300.00 |
| Amount in G-115 | $200,000.00 |

(1909). The rationale of these cases was held to apply to the Desert Land Act of 1877, March 3, 1877, ch. 107, 19 Stat. 377, in United States v. Mackintosh, 85 F. 333 (8th Cir. 1898).

However, *Mackintosh* was decided before the enactment of certain amendments to the Desert Land Act and without the benefit of Supreme Court precedent construing the Act. We decline to follow it.

The rationale of the cases holding that the Land Department could not restrict the right of any entryman under the timber acts to make arrangements to dispose of his land prior to patent was that such a restriction constituted a restraint on alienation not contained in the statute. The Desert Land Act of 1877, like the timber acts, contained no restraint on alienation subsequent to entry. However, the Act of March 3, 1891, ch. 561, § 7, 26 Stat. 1095 (codified as 43 U.S.C. § 329), repealed the timber culture laws and amended the Desert Land Act to provide:

" * * * [N]o person or association of persons shall hold by assignment or otherwise prior to the issue of patent, more than three hundred and twenty acres of such arid or desert lands * * *.

"Provided, however, That additional proofs may be required at any time within the period prescribed by law, and that the claims or entries made under this or any preceding act shall be subject to contest, as provided by the law, relating to homestead cases, for illegal inception, abandonment, or failure to comply with the requirements of law, and upon satisfactory proof thereof shall be cancelled * * *." (Emphasis deleted.)

Under the Homestead Act cases referred to in the amendment it was illegal to make a contract to convey an unpatented entry. *E. g.,* Anderson v. Carkins, 135 U.S. 483, 10 S.Ct. 905, 34 L.Ed. 272 (1890).

The Land Department construed the 1891 amendment as allowing open assignments of an entry with the assignee completing the proof of the entryman but as permitting the Department to cancel an entry if a secret assignment were made. Herbert C. Oakley, 34 Interior Dec. 383 (1906). The rationale of this decision is that the recognition of a right of an entryman to secretly dispose of his land "might easily operate to nullify that provision of the act which declares that 'no person or association of persons shall hold, by *assignment* or *otherwise,* prior to the issuance of patent, more than three hundred and twenty acres * * *.'" (Emphasis in opinion.) *Id.* at 386. This construction of the Act was approved in United States v. Hammers, 221 U.S. 220, 31 S.Ct. 593, 55 L.Ed. 710 (1911), where the Supreme Court, faced with the question of whether assignment was permitted at all under the 1891 amendments, allowed itself to be guided by the then long-standing administrative practice of allowing public assignments to qualified assignees. Congress also approved the administrative construction of the Act when, in the course of adding a provision prohibiting assignments to corporations, it codified the requirement that assignees possess the same qualifications as entrymen. Act of March 28, 1908, ch. 112, 35 Stat. 52 (codified as 43 U.S. C. § 324).

Hoodco, however, submits that the administrative practice of canceling entries when secret assignments are discovered is inapplicable because, unlike the secret assignment in *Oakley,* the arrangement here was not an explicit formal contract, but merely an undisclosed "understanding" between the entryman and the developers that would not have been legally enforceable even if it had not been kept secret.

But secret "arrangements" and "understandings," like more formal contracts to pass title to desert land grants after patent, undermine the Interior Department's power and duty to enforce the restrictions on the recipients of the government's bounty. However quixotic

it may seem at this late date to say so, Congress never intended bargain-price desert land to be provided for the benefit of corporations or large landholders.

In the present case there was an understanding that title to the lands would pass after patent, and that understanding was not revealed by the claimants. Because "the purpose and necessary effect of the conspiracy complained of was to obtain the lands of the United States by the suppression of facts which, had they been disclosed, would have rendered the acquisition impossible," the patents and entries must be canceled. United States v. Keitel, 211 U.S. at 395, 29 S. Ct. at 130, 53 L.Ed. 230.

### III

■ As to the unpatented lands, Hoodco argues that the administrative hearings and cancellation of the entries were invalid because the Secretary had no power to set aside the 1964 decision of the Bureau of Land Management.[9] Even if this argument were impeccable, however, it would afford Hoodco little solace. Were the Secretary obliged to issue the remaining patents, he would only be duty bound to cancel them, for the same fraud that vitiates the patents already granted infects the unpatented entries. Furthermore, Hoodco's argument is not correct.

■ Hoodco urges that the setting aside of the 1964 decision violated the Constitution, the Administrative Procedure Act, and the regulations of the Secretary, and that the Secretary was estopped from reopening the 1964 decision

by Hoodco's detrimental reliance. We reject all of these contentions.

The reopening was justified by 43 C. F.R. § 1843.9 (1965):

"When any party fails to appeal to the Secretary from an adverse decision of the Director, that decision shall as to such party be final and will not be disturbed except for fraud or gross irregularity."[10]

We approve the implicit finding of the Secretary that there was "fraud or gross irregularity" in the original dismissal of the contest on a stipulated record which did not reveal material facts, as well as in the conduct of the patentees and developers.

■ Nor did the reopening violate the Constitution. Prior to patent the Secretary retains jurisdiction over public lands. Knight v. United States Land Association, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974 (1891). While the Secretary may not impose "conditions and stipulations ad infinitum," Chapman v. El Paso Natural Gas Co., 92 U.S.App.D. C. 154, 204 F.2d 46, 52 (1953), he does "have the power, in a proper case, to correct his own errors." Boesche v. Udall, 373 U.S. 472, 478, 83 S.Ct. 1373, 1377, 10 L.Ed.2d 491 (1963).

■ Hoodco urges that the decision to reopen deprived it of "property" and that therefore the decision to reopen could be made only upon notice and after a hearing. But the decision to reopen deprived Hoodco of no rights in the land. Having made their claims and entered upon the land, the entrymen became vested with equitable title. The

---

9. Hoodco urges that the 1964 decision was the decision of the Secretary rather than that of the Bureau of Land Management. We disagree. The purported "concession" by government counsel that the decision was that of the Secretary was merely an argument that it was legally irrelevant who made the decision, a point we need not decide. When asked specifically whether they made such a concession, government counsel stated that they did not and that in fact the director of the BLM had made the erroneous decision.

Nor does the fact that the decision of the BLM was announced in a press release issued through the office of the Secretary render it the decision of the Secretary. A press release like the one issued operates as an announcement of the fact of lower-echelon governmental action, nothing more. Cf. F.T.C. v. Cinderella Career & Finishing Schools, 131 U.S.App. D.C. 331, 404 F.2d 1308 (1968).

10. The Secretary's authority to reopen is now expressed in more general terms in 43 C.F.R. § 4.5 (1972).

abortive initial contest did not increase their entitlement to the legal title that would pass if patent issued. *Cf.* Cameron v. United States, 252 U.S. 450, 459–463, 40 S.Ct. 410, 64 L.Ed. 659 (1920). Nor did the decision to set aside the first contest diminish their rights in the land. These rights could be, and were, taken away only after a hearing directed to the issue of the legality of the entries. The only deprivation suffered was the burden of having to defend against a contest of the entries. This burden is not light, but it was not imposed without a prior hearing. The memorandum of the Solicitor to the Secretary recommending reopening and the decision of the Secretary were given to the claimants prior to the hearing on the merits, and they had an opportunity to argue to the hearing examiner that the case could not be reopened. This was all the hearing to which the claimants were constitutionally entitled. *Cf.* Ferry v. Udall, 336 F.2d 706, 714 (9th Cir. 1964), cert. denied, 381 U.S. 904, 85 S.Ct. 1449, 14 L.Ed.2d 286 (1965).

■ Our analysis of the constitutional issue also disposes of Hoodco's contention that section 5(d) of the Administrative Procedure Act, 5 U.S.C. § 554(d) was violated by the response of the Solicitor's office to the Secretary's request for advice on the propriety of the original decision. Hoodco urges that the memorandum was a private communication with the "judge" in violation of A.P.A. § 5(d). But section 5 applies only to adjudication required by statute or the Constitution to be "determined on the record after opportunity for an agency hearing * * *." A.P.A. § 5(a), 5 U.S.C. § 554(a). Since there was no statutory or constitutional requirement that the Secretary's decision be preceded by a formal hearing, the communication was not unauthorized.

Nor was the government estopped by the first decision. As a general rule the government is not estopped to attack illegality. Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917). Hoodco urges that the government should be estopped in this case as an exception to the general rule because the dismissal of the 1964 contest purported to be final and because of Hoodco's heavy expenditures in reliance on the 1964 decision. But Hoodco knew of its own illegal conduct, and should have recognized the risks inherent in its fraud. Given that the Secretary could legally set aside an erroneous decision prior to patent if such conduct came to light, Hoodco's position is no better than that of a litigant who conceals evidence and then relies on an erroneous lower court decision that is overturned on appeal.

In any event, Hoodco has not made out a sufficient case of detrimental reliance. By the time of the 1964 decision virtually all of the major expenditures on the farm had been completed in reliance on prior arrangements with the entrymen. The only specific expenditures that Hoodco asserts it made in reliance on the 1964 decision were a loan commitment fee, a contract with a manager to run the farm, and ordinary farming expenditures. While Hoodco may not have recouped all of these expenditures in profit from the land in the years since 1964, the amount allegedly lost in reliance on the 1964 decision is negligible compared to the value of the land.

Both judgments are reversed with instructions to enter judgments for the government.