687 F.2d 1067
 4 ITRD 1313, 66 A.L.R.Fed. 264
 GALLAGHER & ASCHER COMPANY, Plaintiff,
and
The Customs Brokers and Foreign Freight Forwarders
Association of Chicago, Inc., Intervening
Plaintiff-Appellant,
v.
William E. SIMON, Secretary of the United States Treasury,
et al., Defendants-Appellees.
 No. 81-2244.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 8, 1982.
Decided Sept. 3, 1982.*
 
 Wayne Jarvis, Chicago, Ill., for intervening plaintiff-appellant.
 Joan C. Laser, Asst. U. S. Atty., Dan K. Webb, U. S. Atty., Chicago, Ill., for defendants-appellees.
 Before CUDAHY and ESCHBACH, Circuit Judges, and EAST, Senior District Judge.**
 CUDAHY, Circuit Judge.
 
 
 1
 In this case the plaintiffs, a customs broker and an association of customs brokers, challenge the procedures employed by the Customs Service in suspending the term special permits of customs brokers in the Chicago area. The district court upheld the lawfulness of the agency's practices. We affirm.
 
 I.
 
 2
 The customs regulations in effect at the time this lawsuit commenced require that customs brokers file entry documents, post a bond, and pay duty fees before imported merchandise is permitted to enter the country. The regulations also contain, however, an exception to this general rule requiring payment of the duty prior to the release of the merchandise. Section 142 of the regulations, 19 C.F.R. § 142 (1976), allows for expedited entry of certain types of imported goods through the issuance of special permits. These special permits may be issued to cover a single transaction (single entry special permit) or they may extend to all of the covered merchandise of a particular broker for a period not to exceed one year (term special permit). Permit holders may secure the immediate release of imported goods under this regulation by submitting their invoices to the customs inspector for examination at the port of entry. If the documents are in order, the merchandise is released immediately without advance payment of the duty. The documents are then returned to the broker, who must thereafter make "timely entry," that is, complete the entry documents and pay the duty. The parties in the present case stipulated that exercise of the immediate release privilege is integral to the business of customs brokers.
 
 
 3
 "Timely entry" is defined by the regulation to mean entry within ten days after the day on which the imported merchandise is first released under a special permit. 19 C.F.R. § 142.11(a) (1976). If the customs broker fails to make timely entry, the transaction is charged against the bond which has been posted and the District Director of the Customs Service initiates a claim for liquidated damages. 19 C.F.R. § 142.15 (1976).[1] The determination that an entry was not timely filed is subject to three levels of administrative review. The initial decision is made by the immediate delivery clerk, who forwards the documents to the import control officer if it appears that the entry was made after expiration of the ten day period. If the import control officer agrees that the entry was untimely, a claim for liquidated damages is served on the tardy customs broker. A copy of the pertinent documents is then submitted to the Fines, Penalties and Forfeitures Branch of the Customs Service for further review. Repeated violation of the timely entry rule by a broker may be brought to the attention of the District Director.
 
 
 4
 In addition to his authority to initiate claims for liquidated damages, the District Director is empowered to discontinue or suspend the special permits of brokers which have "repeatedly failed to make timely entry without sufficient justification." 19 C.F.R. § 142.7(a) (1976). In implementing this regulation, the District Director's practice is to commence formal action against a customs broker only when it has been guilty of five or more late entries in a given month. A warning letter is first issued to the offending broker, listing the untimely filings that are deemed to be excessive in number, and threatening suspension of the broker's special permit if its performance in succeeding months does not improve. If the broker's compliance with the timely entry requirement has not improved after another month, the District Director then issues a suspension notice, usually effective on a few days' notice. Although the regulations do not provide for a formal hearing in connection with the suspension of special permits, it has been the practice of the District Director to hear on an informal basis objections to warning letters and to suspension notices. The district court found, in a finding we cannot say is clearly erroneous, that the use of this avenue of redress had successfully resulted in the correction of agency errors associated with the suspension of special permits. By invoking this informal hearing procedure, an offending broker may either challenge the basis for the warning or suspension, or plead mitigating circumstances. Questions relating to the administration of the immediate release regulations can, in addition, be raised by customs brokers during their open meetings conducted bimonthly with the District Director.
 
 
 5
 Gallagher & Ascher Company ("Gallagher") was at the time this case began a licensed customs broker in Chicago. It had enjoyed immediate release privileges for many years under a series of term special permits. On July 23, 1976, District Director Herz issued a warning letter to Gallagher, accusing it of making nine late entries in the preceding month. The warning letter stated that this number of violations was unacceptably large and advised that if Gallagher's performance did not improve its term special permit would be suspended in September. Gallagher took no action to contest the basis of this warning or to seek clarification so as to avoid the threatened suspension. When Gallagher made twenty-one untimely entries in August, District Director Herz, in a letter dated September 13, 1976, issued an order suspending Gallagher's term special permit for a period of thirty days commencing at the close of the business day on September 17, 1976. Upon receiving the suspension notice, Gallagher for the first time requested a meeting with agency officials. Herz was unavailable so a meeting was arranged with Acting District Director White on September 17, 1976. After hearing argument by Gallagher's lawyer in mitigation of the penalty, White ordered the suspension reduced to fifteen days. This was the first time Gallagher had been forced to undergo a suspension of its term special permit.[2] Because the suspension applied only to the immediate release of merchandise under Gallagher's own term special permit, Gallagher was free to use during its suspension the special permits of its importer customers. Most of Gallagher's larger customers possessed their own special permits and, hence, undisputed testimony reflects that Gallagher's suspension affected the business of only twenty-five percent of its clients.
 
 
 6
 Alltransport, Inc., another licensed customs broker, also received a thirty day suspension in a letter dated September 13, 1976. Alltransport's suspension followed two warning letters, dated March 15, 1976, and July 22, 1976, and twenty-four untimely entries in August. Like Gallagher, Alltransport took no action in response to the agency's warnings until after suspension was imposed. Acting District Director White granted Alltransport's request for a meeting on September 21, 1976, after which he reduced the suspension to fifteen days. The suspension affected only three percent of Alltransport's business.
 
 
 7
 Gallagher filed the instant action in the district court on September 21, 1976. Its complaint challenged the suspension of its term special permit as well as the constitutionality of the regulations dealing with special permits. The complaint sought declaratory and injunctive relief on the grounds that the regulations were unconstitutionally vague and violative of substantive due process and that both the due process clause and the Administrative Procedure Act mandated a full trial-type hearing prior to the imposition of suspension. Alltransport filed a similar complaint on September 24, 1976. On October 27, 1976, the Customs Brokers and Foreign Freight Forwarders Association of Chicago, Inc. (the "Association") was granted leave to intervene in Gallagher's case. The Association is a non-profit corporation composed of thirty licensed customs brokers (including Gallagher) all of which hold special permits. By agreement of the parties, Alltransport's complaint was dismissed when the Association's motion to intervene was granted.
 
 
 8
 The district court on September 23, 1976, entered a temporary restraining order prohibiting the suspension of Gallagher's term special permit; the defendants agreed in addition not to suspend the special permits of the Association's other members during the pendency of the litigation. This prohibition on suspensions continued in effect until June 29, 1981, when the district court entered judgment in favor of the defendants (the "government").[3] Only the Association appeals from this judgment.[4]
 
 II.
 
 9
 Our review of the district court's decision begins with the government's claim that the instant case is now moot. Gallagher was adjudicated a bankrupt on November 24, 1980, and is no longer in business as a customs broker. Alltransport has already completed its suspension. Thus, it remains for the Association to demonstrate that it has a sufficient stake in the outcome of this litigation to render this a justiciable case or controversy. The government argues that the requisite interest is lacking because there is no evidence that any broker member of the Association faces a real and immediate threat of suspension and because recent amendments to the customs laws and regulations reduce the likelihood that term special permits will be suspended by the District Director.
 
 
 10
 We reject the government's suggestion of mootness because we believe that the instant case falls within the exception to the mootness doctrine for cases that are "capable of repetition, yet evading review." Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). We recently described the requirements for the application of this exception as follows:
 
 
 11
 First, the challenged action must be found to be "too short to be fully litigated prior to its cessation or expiration." Second, there must be "a reasonable expectation that the same complaining party (will) be subjected to the same action again."
 
 
 12
 Harvey v. Seevers, 626 F.2d 27, 29 (7th Cir. 1980) (quoting Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam)).
 
 
 13
 Both of the elements of this standard were satisfied in the instant case. Because the suspensions of the term special permits were announced on only a few days' notice and were relatively short in duration, a judicial challenge to the Customs Service's actions cannot be "fully litigated" prior to the expiration of the challenged suspensions. This remains true even though jurisdiction over cases such as the present one would now rest with the Court of International Trade. See 28 U.S.C. § 1581(i) (Supp. IV 1980). We therefore conclude that the first element is met here.
 
 
 14
 We also think that there is a reasonable expectation that members of the Association will be threatened with agency action similar to that taken against Gallagher and Alltransport. The record reflects that a number of customs brokers received warnings from the District Director that their term special permits might be suspended under the authority of the immediate release regulations. In addition, there is nothing in the Customs Procedural Reform and Simplification Act of 1978, Pub.L.No.95-410, 92 Stat. 888 (1978), that eliminates the likelihood of future suspensions of term special permits. That statute, and the regulations promulgated under it, have the effect of adopting as a general rule the release of imported merchandise before payment of the duty. Although this reform in effect permits generally what was before allowed only under a special permit, the new regulations continue to authorize the issuance of term special permits for limited classes of merchandise. 19 C.F.R. §§ 142.21-142.29 (1981). The authority of the District Director to suspend special permits, formerly contained in 19 C.F.R. § 142.7(a) (1976), now appears substantially unchanged in 19 C.F.R. § 142.25(a)(1) (1981). Hence, the District Director continues to enjoy the authority to suspend special permits for failure to make timely entry, the very agency action being challenged in the instant case. We also observe that by expanding the immediate entry exception into a general rule, the new regulations actually broaden the impact of the agency's power to withhold immediate release privileges for failure to timely file entry documents. See 19 C.F.R. § 142.13(a)(1) (1981). Accordingly, we hold that the present case is not moot.
 
 III.
 
 15
 The plaintiffs contend that customs brokers such as Gallagher and Alltransport have a right to a full adjudicatory hearing under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 556, 557 (1976), before their term special permits can be suspended under the authority of the applicable customs regulation. 19 C.F.R. § 142.7(a) (1976). We hold that customs brokers are not entitled to an adjudicatory hearing under the APA prior to the suspension of their term special permits and that the additional procedural requirements contained in 5 U.S.C. § 558(c) (1976), were satisfied in the instant case.
 
 
 16
 The APA provides that the formal adjudicatory procedures described in sections 556 and 557 must be followed "in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing ...." 5 U.S.C. § 554(a) (1976). The APA, as many courts have recognized, does not itself mandate that a trial-type hearing be held where none is required under the administrative agency's own governing statute; the APA simply dictates the procedures to be followed when another statute provides for a hearing. Colorado v. Veterans Administration, 602 F.2d 926, 928 (10th Cir. 1979), cert. denied, 444 U.S. 1014, 100 S.Ct. 663, 62 L.Ed.2d 643 (1980); Sisselman v. Smith, 432 F.2d 750, 754 (3d Cir. 1970). Thus, if the governing statute does not require that a hearing be conducted in connection with a particular agency action, sections 556 and 557 do not come into play. Illinois v. Nuclear Regulatory Commission, 591 F.2d 12, 14 (7th Cir. 1979); Taylor v. District Engineer, U. S. Army Corps of Engineers, 567 F.2d 1332, 1336 (5th Cir. 1978); Briscoe v. Levi, 535 F.2d 1259, 1265 n.28 (D.C.Cir.1976), vacated and remanded, 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977); Reed v. Morton, 480 F.2d 634, 643 (9th Cir.), cert. denied, 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973). In the instant case, the regulation authorizing the District Director to suspend a broker's term special permit does not provide an opportunity for an agency hearing. 19 C.F.R. § 142 (1976). Consequently, section 554(a) of the APA does not require that a permit suspension comply with the procedures specified in sections 556 and 557.
 
 
 17
 In their search for a statutory right to a full adjudicatory hearing, the plaintiffs fasten upon section 558(c), 5 U.S.C. § 558(c) (1976), which relates to agency action concerning licenses.[5] The plaintiffs argue that this section provides in all license suspension and revocation cases an independent right to an adjudicatory hearing meeting the procedural requirements of sections 556 and 557.
 
 
 18
 Section 558(c) of the APA provides in pertinent part:
 
 
 19
 When application is made for a license required by law, the agency, with due regard for the rights and privileges of all the interested parties or adversely affected persons and within a reasonable time, shall set and complete proceedings required to be conducted in accordance with sections 556 and 557 of this title or other proceedings required by law and shall make its decision. Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given-
 
 
 20
 (1) notice by the agency in writing of the facts or conduct which may warrant the action; and
 
 
 21
 (2) opportunity to demonstrate or achieve compliance with all lawful requirements.
 
 
 22
 5 U.S.C. § 558(c) (1976).
 
 
 23
 The plaintiffs cite two cases which in our view support their claimed right to a full adjudicatory hearing under section 558(c). In New York Pathological and X-Ray Laboratories, Inc. v. Immigration & Naturalization Service, 523 F.2d 79, 82 (2d Cir. 1975), a divided panel of the Second Circuit interpreted section 558(c) to mean that, "(e)xcept in limited cases involving willfulness and jeopardy of public health, interest or safety, the Administrative Procedure Act, 5 U.S.C. § 556 and 557 (1970), mandates an agency, in withdrawing, suspending or revoking licenses, to proceed on notice and to provide the opportunity for interested parties to be heard."[6] The court's analysis was framed in terms of the second sentence of section 558(c) even though the challenged agency action[7] could more appropriately have been regarded as a denial of a license application and, thus, governed by the first sentence of section 558(c). The second case supporting the plaintiffs' position is Porter County Chapter of the Izaak Walton League of America, Inc. v. Nuclear Regulatory Commission, 606 F.2d 1363, 1368 n.12 (D.C.Cir.1979), in which the court interpreted section 558(c) as triggering section 556-557 procedures in license revocation cases: "Section 558(c) provides, in truth, that an agency shall adhere to the procedures for adjudications specified in 5 U.S.C. §§ 556, 557 (1976) for any revocation proceeding, and also requires additional procedures, such as according the licensee the opportunity to rectify the difficulties that caused institution of the revocation proceeding." (Emphasis supplied). The court's discussion was brief, it cited no judicial authority or legislative history, and it may have been dictum,[8] but its understanding that section 558(c) confers a right to an adjudicatory hearing was stated without equivocation.
 
 
 24
 We believe that the interpretation of section 558(c) in these two cases is inconsistent with both the plain language and the legislative history of that section. Accordingly, we reject the reasoning of these cases and hold that section 558(c) does not by itself create a right to a full adjudicatory hearing (within the meaning of sections 556 and 557) for agency proceedings revoking or suspending licenses.
 
 
 25
 The instant case involves an agency decision to suspend a license and thus is governed by the second sentence in section 558(c). Read literally, all that this sentence requires of an agency proposing the suspension of a license is that the licensee receive prior written notice of the facts warranting the suspension and an "opportunity to demonstrate or achieve compliance" with all legal requirements. It does not mandate any sort of hearing, let alone the trial-type hearing described in sections 556 and 557. The legislative history of the section confirms this literal interpretation and demonstrates that the sole purpose of the second sentence was to provide a licensee threatened with the termination of its license an opportunity to correct its transgressions before actual suspension or revocation of its license resulted. As noted in the Senate Judiciary Committee's report on this provision, "(t)he second sentence is designed to preclude with withdrawal of licenses, except in cases of willfulness or the stated cases of urgency, without affording the licensee an opportunity for the correction of conduct questioned by the agency." Legislative History of the APA, 79th Cong., 2d Sess. 35 (1946).[9] It is also evident from the legislative history of section 558(c) that the special treatment accorded licensees was not intended to trigger a right to an adjudicatory hearing meeting the requirements of sections 556 and 557. The House Judiciary Committee, commenting on an earlier version of section 558(c), stated that "(t)his section operates in all cases whether or not hearing is required, but it does not provide for a hearing where other statutes do not do so." Legislative History, supra, at 275. (Emphasis supplied).
 
 
 26
 On the basis of these statements from the legislative history, we hold that section 558(c) does not itself create a right to a full adjudicatory hearing before a license may be suspended or revoked, but simply imposes separate procedural requirements in addition to those procedures that may otherwise be required under section 554(a) of the APA. These separate procedural requirements afford a licensee faced with the revocation or suspension of its license an opportunity for a "second chance," George Steinberg and Son, Inc. v. Butz, 491 F.2d 988, 993-94 (2d Cir.), cert. denied, 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 55 (1974), or an opportunity to put its house in lawful order before more formal agency proceedings are undertaken, Blackwell College of Business v. Attorney General, 454 F.2d 928, 933-34 (D.C.Cir.1971). Whether a formal adjudicatory hearing is required under the APA in connection with an agency decision to revoke or suspend a license, however, continues to depend on whether the decision is "required by statute to be determined on the record after opportunity for an agency hearing ...." 5 U.S.C. § 554(a) (1976).
 
 
 27
 In support of their argument that section 558(c) entitles customs brokers to an adjudicatory hearing prior to the suspension of their term special permits, the plaintiffs also invoke this court's decision in United States Steel Corp. v. Train, 556 F.2d 822 (7th Cir. 1977). The issue in that case was whether the Environmental Protection Agency's decision to grant a permit to discharge pollutants was subject to the procedural requirements of sections 556 and 557 of the APA. We held on two alternative grounds that an adjudicatory hearing was in fact required. First, we concluded that the substantive statute, the Federal Water Pollution Control Act, 33 U.S.C. § 1342(a)(1) (1976), in providing an "opportunity for public hearing," triggered sections 554, 556 and 557. Second, we found an independent basis for the right to a full adjudicatory hearing located in section 558(c). Our complete discussion of section 558(c) follows:
 
 
 28
 Sections 556 and 557 are applicable for another reason: § 558(c) of the APA provides, independently of § 554 of that Act, that "(w)hen application is made for a license required by law" the agency shall hold proceedings which shall be "conducted in accordance with sections 556 and 557." Because this is a license application proceeding, §§ 556 and 557 apply whether or not § 554 does.
 
 
 29
 556 F.2d at 833-34 (footnote omitted). Since our decision in U. S. Steel, at least three other circuits have expressly rejected its interpretation of section 558(c). Seacoast Anti-Pollution League v. Costle, 572 F.2d 872, 878 n.11 (1st Cir.), cert. denied, 439 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d 117 (1978); Taylor v. District Engineer, U. S. Army Corps of Engineers, 567 F.2d 1332, 1337 (5th Cir. 1978); Marathon Oil Co. v. Environmental Protection Agency, 564 F.2d 1253, 1260-61 n.25 (9th Cir. 1977); see also Lincoln Transit Co. v. U. S., 256 F.Supp. 990, 994 (S.D.N.Y.1966) (three-judge court); 2 K. Davis, Administrative Law Treatise § 12:10, at 450 (2d ed. 1979). These decisions, which involved license applications, concluded that there is no independent right to an adjudicatory hearing under section 558(c), relying on the APA legislative history, portions of which we have already set forth.
 
 
 30
 Our interpretation of section 558(c) in U. S. Steel may bear reexamination in light of these cited decisions, but we need not undertake such an examination in the instant case. U. S. Steel was a license application case, which is governed by the first sentence of section 558(c), while the instant case involves a license suspension within the ambit of section 558(c)'s second sentence. This distinction is not without substance because the U. S. Steel court reached its conclusion largely on the basis of the reference in the first sentence to section 556-557 procedures. That reference is not repeated in the second sentence dealing with license suspensions and revocations.[10] Thus, we restrict our holding that section 558(c) does not confer an independent right to an adjudicatory hearing to cases falling within the ambit of the second sentence of section 558(c). Reconsideration of our decision in U. S. Steel must wait until another day when a genuine license application case is presented to us.
 
 
 31
 Although section 558(c) does not confer on the plaintiffs a right to a full adjudicatory hearing prior to the suspension of their term special permits, it does afford them certain procedural protections. The "second chance" doctrine of section 558(c) obligates the District Director, before suspending a term special permit, to provide the customs broker advance written notice of "the facts or conduct which may warrant the action" as well as an "opportunity to demonstrate or achieve compliance with all lawful requirements." The district court concluded that the District Director had met his obligations under this section and we agree.
 
 
 32
 The notice requirement was satisfied in the instant case by the warning letters sent by the District Director to Gallagher and Alltransport. These letters stated the number of cases in which the two brokers had made late entries, and warned that the brokers' term special permits would be suspended unless they reduced the unacceptably large number of untimely filings. Gallagher was sent a warning letter on July 23, 1976, and Alltransport was sent two such letters, dated March 15, 1976, and July 22, 1976. The actual suspension letters, which referred to these previous warnings,[11] were not issued until September 13, 1976. These warning letters provided more than sufficient notice of the facts warranting the suspensions and allowed the brokers more than adequate time to put their houses in order and thereby avoid the subsequent suspensions.
 
 
 33
 The second requirement of section 558(c)-an opportunity to demonstrate or achieve compliance-was also met in the instant case. An opportunity to achieve compliance was, indeed, the very purpose of the warning letters, which threatened suspension of the term special permits only if the brokers' conduct did not improve. Such a notice of violations and a request to comply in the future meets the requirements of section 558(c). Glover Livestock Commission Co. v. Hardin, 454 F.2d 109, 114 (8th Cir. 1972), rev'd on other grounds, 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973). The plaintiffs were in addition afforded an opportunity to demonstrate their compliance with the ten day limit for making entry. 19 C.F.R. § 142.11(a) (1976). It was the practice of the District Director to hear objections to warning letters and suspension notices. Gallagher in particular was cognizant of this practice as it successfully avoided a suspension in 1972 after a meeting with the District Director. The written notices threatening agency action did not have to contain an express offer of a meeting with agency officials; it was enough that such an opportunity was available if requested. Shuck v. SEC, 264 F.2d 358, 360 (D.C.Cir.1958). The plaintiffs in the instant case did not request such a meeting until after they had received suspension letters. Even then, however, they were granted a meeting with Acting District Director White, who reduced the suspensions from thirty to fifteen days. It is true that White had little knowledge of the specific cases of untimely entry relied on in the suspension letters, but this does not mean that there was no opportunity to demonstrate compliance with the timely entry regulation. The plaintiffs could have requested a meeting at an earlier date and could have presented to White their evidence showing that the entries cited in the warning and suspension letters were timely made. The plaintiffs took neither action and, under the circumstances, we are unable to conclude that they were denied all opportunity to demonstrate compliance with the regulation.
 
 IV.
 
 34
 The plaintiffs' next contention is that the procedures utilized by the District Director in suspending term special permits deprived the brokers of their right to procedural due process. They insist that the due process clause requires that they be afforded a "full complement" of procedural safeguards.
 
 
 35
 It is axiomatic that before the government can deprive a person of a protected interest in property, the due process guarantee of the Constitution requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 13, 98 S.Ct. 1554, 1562, 56 L.Ed.2d 30 (1978) (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)) (citations omitted). Due process mandates that there be an opportunity for "some kind of hearing" before a person is finally deprived of his or her property, Wolff v. McDonnell, 418 U.S. 539, 577-78, 94 S.Ct. 2963, 2985-86, 41 L.Ed.2d 935 (1974), and that such hearing occur "at a meaningful time and in a meaningful manner," Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). The contours of due process are flexible, however, and the requirement of a hearing is limited to that which is "appropriate to the nature of the case." Bell v. Burson, 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971); Mullane, supra, 339 U.S. at 313, 70 S.Ct. at 656.
 
 
 36
 No one questions that the term special permits at issue in the present case constitute protectible property interests.[12] Thus we must decide whether the District Director in suspending the term special permits of Gallagher and Alltransport provided constitutionally adequate procedures. Our analysis follows the Supreme Court's decision in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), where the Court adopted an explicit balancing approach for assessing the sufficiency of the procedures associated with government action affecting important interests:
 
 
 37
 (I)dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 38
 424 U.S. at 335, 96 S.Ct. at 903. See also Sutton v. City of Milwaukee, 672 F.2d 644, 645-46 (7th Cir. 1982) (Mathews "announced a simple cost-benefit test of general applicability"). We have considered these factors and conclude that, on balance, the District Director's procedures are not constitutionally infirm.
 
 
 39
 We emphasize at the outset that we review the constitutionality of the two suspensions in the light of the procedural safeguards available to Gallagher and Alltransport, and not in terms of the procedures actually invoked by them. As discussed above, it was the practice of the District Director to hear on an informal basis any objections to warning letters or suspension notices. This opportunity for an informal hearing, which had in the past resulted in the correction of agency error, was not exploited by the suspended customs brokers until after they had received their suspension notices. At the eleventh hour, they hastily requested and were granted a meeting with agency officials. At these meetings, Gallagher and Alltransport did not ask the Acting District Director to review the brokers' files for clerical errors in the computation of late entries; nor did they contest the factual basis for the suspensions. Instead, they pleaded the existence of mitigating circumstances, in response to which the Acting District Director reduced the suspensions from thirty to fifteen days.[13] We therefore proceed to consider the adequacy of the District Director's procedures in the context of the customs brokers' own conduct.
 
 
 40
 The first factor we must weigh under Mathews is the private interest affected by the official action. The interest of customs brokers in the exercise of immediate release privileges is concededly a substantial one. The parties in this case stipulated that regular use of the expedited clearance procedure was an integral part of the daily business operations of the customs brokers. However, we are not dealing in the instant case with a complete revocation of immediate release privileges but only with the suspension of a term special permit for a period of fifteen days. The impact of this deprivation is also mitigated by the fact that the suspended customs brokers could continue to secure the immediate release of merchandise during their suspensions by use of their importers' special permits. The suspensions thus affected only three percent of Alltransport's business and only twenty-five percent of Gallagher's clients. Because "the degree of potential deprivation that may be created by a particular decision is a factor to be considered" in evaluating the adequacy of agency decision-making processes, Mathews, supra, 424 U.S. at 341, 96 S.Ct. at 905, we conclude that the impact of the two suspensions, relatively short in duration and affecting only a portion of the customs brokers' business, was not so great as to require more formal procedures than were afforded.
 
 
 41
 The second factor we must consider is the risk of an erroneous suspension under existing procedures and the probable value, if any, of additional or substitute procedural safeguards. We believe that this factor also weighs in favor of current procedures. The principal risk of error in ordering a suspension under Rule 142.7(a) of the regulations lies with the initial determination that an entry was not timely made, for it is the repeated failure to make timely entry that forms the basis for a suspension. As noted, this determination is subject to three levels of administrative review before the District Director considers suspension, and the risk of error is consequently rather low. More importantly, though, any errors that do arise can generally be corrected through written objection to the District Director or through initiation of the informal hearing procedure available to all customs brokers threatened with suspension.[14] Neither Gallagher nor Alltransport made use of these avenues of redress and we thus are unable to conclude that additional safeguards were necessary.
 
 
 42
 The third factor we must assess in the instant case also supports the conclusion that the procedures followed by the District Director were constitutionally adequate. The government's interests in enforcing the ten day entry requirement and in preventing abuse of the immediate release privilege are substantial. For each instance of delayed entry, the District Director must commence at great administrative cost a liquidated damages case. Although the government's interest in the collection of revenue is ultimately protected by the bond posted by the tardy customs brokers, untimely entry deprives the government of the required duty until entry is finally made or until proceedings to collect on the bond are completed. Thus, the revenue from the duty is temporarily withheld from the government when entry is not timely filed and the government is forced to expend scarce fiscal and administrative resources to protect its interests. We conclude that these government interests outweigh the factors supporting additional procedural safeguards, the costs of which would be unduly great.[15]
 
 
 43
 Having carefully reviewed the particular facts of the instant case in light of the relevant factors, we conclude that the District Director did not deprive Gallagher and Alltransport of their rights to procedural due process.
 
 V.
 
 44
 Finally, we consider and reject the plaintiffs' contentions that the regulation under which the District Director acted in the instant case, 19 C.F.R. § 142.7(a) (1976), is unconstitutionally vague and is not rationally related to a legitimate government interest. "(I)n the light of the facts of the case at hand," United States v. Mazurie, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975), the regulation is not impermissibly vague. The terms "repeated failure" and "sufficient justification" clearly apply to Gallagher and Alltransport since the number of untimely filings that formed the basis of their suspensions far exceeded the number that they had been previously advised was unacceptably large. Moreover, any uncertainty over the meaning of these terms could easily have been clarified by an inquiry directed to agency officials. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., --- U.S. ----, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). The challenged regulation is also not irrational. The suspension provision serves the legitimate government interest in collecting customs duties without undue expense and in preventing abuse of the immediate release privilege.
 
 VI.
 
 45
 For the reasons stated herein, we affirm the judgment of the district court.
 
 
 46
 Affirmed.
 
 
 
 *
 Because of an arguable conflict with decisions of the District of Columbia and Second Circuits, Part III of this opinion has been circulated among all judges of this court in regular active service. No judge favored a rehearing in banc. See 7th Cir. R. 16(e)
 
 
 **
 Honorable William G. East, Senior District Judge for the District of Oregon, is sitting by designation
 
 
 [1]
 A customs broker against which a claim for liquidated damages has been made may petition the District Director for cancellation of liquidated damages. 19 C.F.R. § 172.22(d) (1976)
 
 
 [2]
 In 1972, however, Gallagher was issued a suspension notice after repeated failure to make timely entry and after receiving a warning letter. Following a conversation with the District Director, during which Gallagher promised improvement of its record, the District Director decided not to impose the suspension
 
 
 [3]
 The defendants include the United States Department of Treasury, the United States Customs Service, the Secretary of the Treasury (William E. Simon), the District Director of the Customs Service for the Chicago District (Heinz L. Herz), the Director of Inspection and Control of the Customs Service for the District of Chicago (Robert J. White), and the Chief of the Fines, Penalties and Forfeitures Branch of the Customs Service for the District of Chicago (Joseph B. Bagdonas)
 
 
 [4]
 For the sake of simplicity, we will refer to Gallagher, Alltransport and the Association collectively as the "plaintiffs," even though only the Association appeals from the decision below
 
 
 [5]
 The APA defines the term "license" to include "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission ...." 5 U.S.C. § 551(8) (1976). The district court assumed arguendo that the term special permits at issue in the present case were "licenses" within the scope of the APA definition. The government in its brief joined in this assumption and, in the absence of any argument before us to the contrary, we will indulge in the assumption that term special permits are "licenses."
 
 
 [6]
 Judge Moore dissented from the court's holding that section 558(c) confers an independent right to an adjudicatory hearing. In his view a right to a hearing cannot be derived from the APA generally, or from section 558(c) specifically, but must emanate from some other source. 553 F.2d at 83-84
 
 
 [7]
 At issue was the designation by the Immigration and Naturalization Service of a list of laboratory facilities approved for medical examinations required of aliens seeking permanent residence status. The plaintiff laboratory obtained a preliminary injunction preventing the agency from denying it designation as an approved facility. The Second Circuit affirmed
 
 
 [8]
 The court in Porter County was presented with a challenge to the agency's procedure for passing upon requests to initiate proceedings to revoke licenses for the construction of nuclear power plants. The court held that section 558(c) simply defines the procedures to govern a revocation proceeding already begun and does not define the conditions under which a proceeding must be instituted. 606 F.2d at 1368. Hence, the court was not particularly concerned with the nature of the procedures required by section 558(c)
 
 
 [9]
 The Attorney General's interpretation of the second sentence of section 558(c), rendered shortly after the enactment of the APA, provides additional evidence that Congress was concerned only with granting licensees an opportunity to correct their transgressions:
 This sentence requires an agency to give a licensee an opportunity to change his conduct before his license can be revoked by the agency unless the licensee's conduct is willful or the public health, interest or safety requires otherwise. Thus, if a particular licensee should under ordinary circumstances transcend the bounds of the privilege granted to him, the agency which has granted him the license must inform him in writing of such conduct and afford him an opportunity to comply with the requirements of the agency before it can revoke, withdraw, suspend or annul his license. While the warning must be in writing, it need not take any special form.
 Attorney General's Manual on the APA 90-91 (1947).
 
 
 [10]
 "Section (558(c) ) is composed of three sentences, each of which is mutually exclusive of the others. The first sentence applies specifically to applications for licenses, the second to suspension or revocation of licenses, and the third to renewals." Attorney General's Manual on the APA 89 (1947) (emphasis supplied)
 
 
 [11]
 The plaintiffs complain that the written notice was insufficient in that it did not specifically identify each of the late entries relied on by the District Director. We conclude that this omission could not have caused prejudice to the plaintiffs because they were well aware which entries were being cited by the District Director as untimely. For each late entry, the agency opens a liquidated damages case seeking collection on the broker's bond. See 19 C.F.R. § 142.15 (1976). As part of this procedure, the agency issues a Customs Form 5955-A to the broker; this form specifically identifies the transaction by number. Thus, the brokers knew, or should have known, which cases formed the basis for the suspensions
 
 
 [12]
 Cf. Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971) (suspension of driver's license must comport with due process)
 
 
 [13]
 The plaintiffs contend that the meetings with Acting District Director White were constitutionally inadequate because he was not authorized to rescind the suspensions under any circumstances. We do not understand White's testimony at trial to indicate that his authority was so circumscribed. White was instructed by District Director Herz not to lift the suspensions if they were warranted but that mitigating circumstances could justify a reduction in the length of the suspensions. White was not offered any evidence at the meetings casting doubt on the imposition of the suspensions and he thus considered only a reduction in the suspensions
 
 
 [14]
 The plaintiffs place considerable emphasis on one example of agency error in the warning letter sent by the District Director to Henry E. Kloch and Company, a customs broker. That letter cited among the seven liquidated damages cases opened by the agency three which had already been waived or cancelled. This is the kind of mistake easily rectified by written objection to the District Director or by oral objection during the available meetings. Cf., Dixon v. Love, 431 U.S. 105, 113, 97 S.Ct. 1723, 1727, 52 L.Ed.2d 172 (1977) (risk of clerical error easily brought to attention of agency without need for a formal hearing)
 
 
 [15]
 Cf., Dixon v. Love, 431 U.S. 105, 114, 97 S.Ct. 1723, 1728, 52 L.Ed.2d 172 (1977) ("Giving licensees the choice thus automatically to obtain a delay in the effectiveness of a suspension or revocation would encourage drivers routinely to request full administrative hearings.")